137 So.2d 859 (1962)
Allen DUDLEY et al., Appellants,
v.
ORANGE COUNTY, Florida, a Political Subdivision, Appellee.
No. 2352.
District Court of Appeal of Florida. Second District.
February 16, 1962.
Hornsby & Newman, Orlando, and Johnie A. McLeod, Apopka, for appellants.
David W. Hedrick of Giles, Hedrick & Robinson, Orlando, for appellee.
SMITH, Judge.
The appellants as plaintiffs filed their complaint against the defendant-appellee, alleging that the defendant had built a dam on the west end of Long Lake and two dams on the east end of Long Lake and raised the grade of a public road, constructed without facilities for passage of water, which caused the water level in Long Lake to rise to the extent that the water level within the area of the dams was from five to nine feet higher than the adjacent lands which constitute the natural drain area for Long Lake, thereby causing the plaintiffs' lands, houses and businesses to be flooded and unusable, causing irreparable damage to the plaintiffs' property. The complaint prayed for injunctive relief. The County answered admitting much of the substance of the complaint, but alleging in great detail the existence of a natural disaster in the *860 area during the time in question and also alleged that during this time, the area was designated a disaster area by the Governor of the State of Florida, the Federal Civil Defense Authorities, and the Board of County Commissioners of Orange County. They contend that even without the damming of the Lake, the level of the waters of the Lake would have been higher than normal; that the damming only increased the degree of flooding; that in the course of the emergency, the County took these temporary measures to protect the health, convenience and welfare of the greatest number of its citizens; that it was proceeding as rapidly as possible to effect a permanent solution and to remove the temporary dams to which the plaintiffs objected; and that without such temporary measures, the homes of approximately seventy-five families valued in millions of dollars and the County roads within the area would have been damaged. The court then entered the following Final Decree:
"This cause coming on for final hearing on the plaintiff's complaint and defendant's Answer, and the Court having heard all the evidence presented by both parties and argument of counsel for plaintiffs and defendant having been heard and the Court on November 15, 1960, having entered the following opinion on the facts and law of the case, towit:
"`Counsel for the respective parties have argued before the Court and submitted citations of authorities which they have found to be most applicable to the case.
"`The Court is of the opinion that the action of the Defendant in erecting and maintaining the dikes in question was authorized both under the Civil Defense Act as well as under the police power. Although such action was lawful, not constituting a tort, yet if as a consequence of such action the lands of the Plaintiffs were flooded to the extent that it amounted to a taking from them, then under the decisions of our Appellate Courts they would be entitled to compensation which might be determined by this Cour(t) or by condemnation proceedings.
"`After carefully studying the authorities furnished by counsel, I have reached the conclusion that the flooded condition is not permanent invasion of Plaintiff's property but is only temporary which has resulted in damage to them but which is not recoverable at law. In order to constitute a taking for which the owners are entitled to compensation it must not only be actualy, but permanent, which this is not.
"`Defendant asserted in its answer that all it had done was temporary and to protect the public health and welfare until a permanent drainage system could be built and it offered evidence to show that diligence was being exercised toward the establishment of such drainage system.
"`The Court is naturally sympathetic toward the Plaintiffs on account of the damage they have suffered but upon a determination that the condition created by defendant in its efforts to protect the County road and many property owners from disaster, same is temporary as opposed to being permanent and that the law does not allow a recovery for such damage, I am obliged to rule against contention that the Court award them damages.'
"And the Court being fully advised, it is thereupon
"ORDERED, ADJUDGED AND DECREED:
"(1) That the Court has jurisdiction over the subject matter in this case and the parties to this litigation.
"(2) That the Answer of Defendant states a defense to the Complaint herein and Defendant has proved the material allegations of such Answer.

*861 "(3) That the relief prayed for by Plaintiffs is hereby denied.
"(4) That the Defendant, Orange County, shall with all due diligence, lower the water level of Long Lake to the level where said lake would be in the absence of the dams at each end of the lake.
"(5) That this Court shall retain jurisdiction of this cause to make such other and further Orders as may be necessary to prevent any more damage to plaintiff's property than is absolutely unavoidable under the circumstances of this case."
The Florida Civil Defense Act, Chapter 252, Florida Statutes, F.S.A., expresses therein the purpose of the act. These purposes are to authorize certain acts in those emergencies resulting from disasters caused first: by enemy attack, sabotage, or other hostile action, or, second: by natural causes, and in either event to provide for the common defense and to protect the public peace, health and safety, and to preserve the lives and property of the people of the state. Under the Act, the term "Civil Defense" means the preparation for and the carrying out of all emergency functions, to prevent, minimize, and repair injury and damage resulting from disasters caused by a flood or other causes, and authorizes all activities necessary or incidental to the preparation for and carrying out of the functions. One of the political subdivisions of the state granted these powers is any county. Although the Act specifies in detail and vests specific emergency powers to the political subdivisions named, most all of the specific delegated emergency powers are prefaced by the statement, "in the event of actual enemy attack against the United States or if a state of emergency contemplating imminent attack, is declared to exist", so these specific additional emergency powers are not here involved. The Act does, however, grant certain powers and immunities to the political subdivisions in the event of natural disaster and among them are:
Authorizes the state civil defense council to make available any equipment, services or facilities for use in any affected area. Section 252.12, Florida Statutes, F.S.A.
Authorizes political subdivisions to appropriate and expend funds, equipment, materials and supplies for civil defense purposes. Section 252.09(2) (a), Florida Statutes, F.S.A.
Provides that any political subdivision (except in cases of willful misconduct, gross negligence, or bad faith), engaged in any civilian defense activity, complying with the Act, shall not be liable for damage to property as a result of such activity. Section 252.18(2), Florida Statutes, F.S.A.
Section 12 of the Declaration of Rights of the Constitution of the State of Florida, F.S.A., provides that private property shall not be taken without just compensation and this Act cannot be construed to nullify that provision. Careful examination of the Act discloses that there is specific provision for the taking of private property only in connection with the exercise of emergency powers granted in the event of an emergency contemplated or during enemy attack, and even then the Act makes provision for determination and requires payment of just compensation. Section 252.07, Florida Statutes, F.S.A.
In addition to the specific powers granted to a county by the civil defense act, as limited and restricted as they are when applied to natural disasters, there is here involved the question as to whether or not under the general principles of law the county had the lawful authority to take these actions; and if so, to do so without compensation to these plaintiffs for their damages.
We refer to Nichols on Eminent Domain, Third Edition, Vol. I, as follows:
"Section 1.42(2) Police power.
"(2) Distinction between taking and regulating. For the sake of accurate *862 thinking it is well to keep in mind the fundamental distinction between the two powers in their application to private property. In the exercise of eminent domain property or an easement therein is taken from the owner and applied to public use because the use or enjoyment of such property or easement therein is beneficial to the public. In the exercise of the police power the owner is denied the unrestricted use or enjoyment of his property, or his property is taken from him because his use or enjoyment of such property is injurious to the public welfare. Under the police power the property is not, as a general rule, appropriated to another use, but is destroyed or its value impaired, while under the power of eminent domain it is transferred to the state to be enjoyed and used by it as its own.
"(3) Police power requires no provision for compensation. A proper exercise of the police power by the sovereign does not require the payment of compensation. Compliance with an enactment of the legislature in the exercise of the police power for purposes of health, morals, safety or welfare without compensation does not constitute a damaging or taking of property without just compensation within the meaning of the law of eminent domain. It follows, therefore, that the constitutional provisions which limit the exercise of the power of eminent domain, so that just compensation must be provided for, have no application to and impose no limitation upon the proper exercise of the police power.
* * * * * *
"Section 1.43 Destruction by necessity.
"(1) Action by private individual. More closely allied to the power of eminent domain is the power of destruction from necessity. In the case of fire, flood, pestilence or other great public calamity, when immediate action is necessary to save human life or to avert an overwhelming destruction of property, any individual may lawfully enter another's land and destroy his property, real or personal, providing he acts with reasonable judgment. * * * The right is a natural one and requires no statutory sanction; in fact it is doubtful if the exercise of the right could be constitutionally prohibited, whereas eminent domain requires specific authority for the legislature to warrant its exercise even by municipal corporations or officers of the state.
"(2) Action by public agent. If the individual who enters and destroys private property happens to be a public officer whose duty it is to avert an impending calamity, the rights of the owner of the property to compensation are no greater than in the case of a private individual. The most familiar example of the exercise of this right is seen in case of a fire. The neighbors and firemen freely trespass on the adjoining land, and houses are even blown up to prevent the spread of the conflagration. The danger of flood or the existence of a pestilence may call for equally drastic action.
"Statutes sometimes provide for compensation in such cases, but unless the provisions of the statute are strictly complied with, the owner stands no better than he did at common law.
"Even in those states in which the statutes regulate or specifically authorize the destruction of property in the presence of impending calamity, such legislation is not the exercise of a new power, but a recognition and continuation of the old power, and hence is due process of law, and does not effect a taking of property without compensation in the constitutional sense."
These general principles have been recognized to some degree by the courts of this *863 state, see Paty v. Town of West Palm Beach, Fla. 1947, 29 So.2d 363; and Pasternack v. Bennett, 1939, 138 Fla. 663, 190 So. 56.
On the question of whether or not the injunction should have been issued, it must be recognized that injunctions should be issued cautiously; and mandatory injunctions are looked upon with disfavor, and the courts are reluctant to issue them. Johnson v. Killian, Fla. 1946, 27 So.2d 345.
With respect to whether or not the actions of the County constituted a taking of the property of the plaintiffs for which the payment of just compensation is required by the Constitution, it would have been necessary for the court to have found that the flooding was a direct result of the dams of the County and the flooding must constitute an actual, permanent invasion of the land, amounting to an appropriation of, and not merely an injury to, the property. 12 Fla.Jur., Eminent Domain, § 70; 18 Am. Jur., Eminent Domain, § 134; and 2 Nichols, Eminent Domain, § 6.23(3).
The record here does not show a continuous flooding for a long period of time in order to work an almost complete destruction of the value of the land in order to destroy its value entirely, inflicting irreparable and permanent injury to effect a constructive taking as were the facts in Pumpelly v. Green Bay & Mississippi Canal Co., 1872, 13 Wall. 166, 20 L.Ed. 557.
The County introduced evidence to sustain the allegations of its answer, the chancellor resolved the questions of fact in favor of the County, and retained jurisdiction to prevent any more damage to plaintiffs' property than was absolutely unavoidable under the circumstances.
The decree is affirmed.
ALLEN, Acting C.J., and KANNER, J., concur.