CITY OF RAPID CITY, a Municipal Corporation under the laws of the State of South Dakota, Petitioner and Respondent,

v.

Edna Kingsbury BOLAND and Vincent H. Boland, Defendants, Cross-Plaintiffs and Appellants.

PENNINGTON COUNTY, South Dakota, Defendant,

v.

STATE of South Dakota, Defendant and Respondent,

and

Hills Material Company, Defendant.

No. 12095.

Supreme Court of South Dakota.

Oct. 26, 1978.

Rehearing Denied Dec. 1, 1978.

Horace R. Jackson of Lynn, Jackson, Shultz, Ireland & Lebrun, Rapid City, for petitioner and respondent.

George A. Bangs and Allen G. Nelson of Bangs, McCullen, Butler, Foye & Simmons, Rapid City, for defendants, cross-plaintiffs and appellants.

Camron Hoseck, Asst. Atty. Gen., Pierre, for defendant and respondent; William J. Janklow, Atty. Gen., Pierre, on the brief.

ZASTROW, Justice.

During the late evening hours of June 9 and the early morning hours of June 10, 1972, a large portion of Rapid City, South Dakota, was inundated by the flood waters of Rapid Creek. In terms of lives lost (over 250) and property destroyed (over 1500 residential and business structures were affected), the flood was one of the greatest disasters in the United States in the twentieth century.

The Governor immediately declared the Rapid City area a disaster beyond local control under the authority of SDCL 33–15–8 and SDCL 33–15–18. Because of the catastrophic nature of the flood, the President issued a major disaster declaration on the basis of an informal request from the Governor. Officials of the Office of Emergency Preparedness were in Rapid City by the afternoon of June 10 to assist the local government in securing federal funds for disaster recovery.

One of the seven categories of funding available for disaster recovery was debris removal. The immediate necessity of debris removal, as testified by the federal officer, was to prevent "the development of mice and rats, flies, and mosquitoes that transmit [and] spread diseases in most disasters, particularly those involving floods; .

if septic tanks (and sewers) are flooded out, you can have the transmission of bacteria * * *. [I]t is very important that you get [the debris] out [and] take those minimum efforts to prevent disease which might occur, typhoid, malaria and encephalitis with the mosquitoes and tetanus and other diseases of that sort * * *."

On June 12 and 13, the city council adopted a resolution authorizing the Corps of Engineers to remove the flood debris and clear the flood areas which it and the city department of public works deemed a critical danger to life, health and safety.

The debris removal project (later known as Operation Bulldozer) was divided into two sections. The western portion of the flood area was to be cleared by the Corps of Engineers and the eastern portion by the city. The city secured federal funds of over $2,000,000 and hired three large local contractors to begin the clean up operation immediately. Operation Bulldozer initially carried as much as two hundred truckloads of debris an hour, twenty-four hours a day.

As the operation progressed, city officials were confronted with hundreds of structures within the clean up area that had damage ranging from severe to slight. It was apparent that the demolition of many of the structures would facilitate the debris removal operation. The building inspection department of the city was given the responsibility for determining which structures would be demolished and removed and which would be allowed to remain.

A volunteer committee consisting of the building inspection department employees, local architects and local engineers was formed to establish a method of determining whether a structure was beyond repair. After several proposals were suggested and discussed, a standard form and point system was devised by the committee.

The form provided for the individual evaluation of roof, floor joists, foundation, interior walls, exterior walls, and whether the condition of the structure constituted a hazard. Each category was provided with a point system. Several three-man teams, each including one employee of the building inspection department, inspected the damaged structures. Any structure which received a point total exceeding twenty-eight was tagged for demolition.

Although the inspection procedure was publicized and some property owners were contacted, no actual notice was given to the individual owners that their structures were to be destroyed. As the clean up operation reached a structure tagged for removal, the tag was checked by the city official for authenticity, and after confirmation, the structure was demolished. About one-half of the buildings damaged in the flood were actually demolished during the clean up operation.

Prior to June 9, Mr. and Mrs. Vincent Boland (Boland) were the owners of a six-room rental residence at 104 North Sixth Street in Rapid City. The house was located within a few feet of the north bank of Rapid Creek. On June 15, Mr. Boland went to the property to inspect it for damage. While there, he met and talked to three men who appeared to be inspecting the building.

The inspection team, directed by building inspection department employee David C. Lamb, had inspected the Boland structure on June 15, had evaluated the structure according to the completed form, and had assessed thirty-two points against it. The building was demolished and removed on June 30 by Hills Material Company, one of the contractors in Operation Bulldozer.

Prior to the removal, Mr. Boland and two other individuals had begun to clean the building and had worked for a total of thirty-six to forty hours. They had succeeded in removing the mud from four of the six rooms and by June 30 had boarded up the doors and windows.

Several months later, the city began a condemnation action against the now vacant Boland lot as part of an urban renewal project. Mr. Boland filed a counterclaim against the city, the State of South Dakota, and Hills Material Company, seeking compensation for the value of the house.

The counterclaim was tried to the court. The trial court entered a memorandum decision, findings of fact and conclusions of law, holding that the city, the state, and Hills Material Company had been engaged in civil defense functions when the Boland structure was destroyed. It further held that since there was no evidence of misconduct, gross negligence or bad faith by the parties, all were granted sovereign immunity under SDCL 33–15–38. Judgment was therefore entered in favor of the city, the state, and Hills Material Company.

The issue to be resolved is whether the legislature can grant governmental immunity, by statute, for every taking or damaging of private property done in the performance of "civil defense activities."

The civil defense immunity statute in effect at the time of the demolition of the Boland structure was SDCL 33–15–38, which provided in part:

"All functions under this chapter and all other activities relating to civil defense are hereby declared to be governmental functions. Neither the state nor any political subdivision thereof, nor other agencies, nor, except in cases of willful misconduct, gross negligence, or bad faith, any civil defense worker complying with or reasonably attempting to comply with this chapter, or any order, rule or regulation promulgated pursuant to the provisions of this chapter, or pursuant to any ordinance relating to blackout or other precautionary measures enacted by any political subdivision of this state, shall be liable for the death of or injury to persons, or damage to property, as a result of such activity."

The scope of civil defense functions is found in the definition of civil defense under SDCL 33–15–1(1):

"(1) 'Civil defense' shall mean the preparation for and the *carrying out of all emergency functions*, other than functions for which military forces are primarily responsible, *to prevent, minimize, repair injury and damage resulting from disasters caused by* enemy attack, sabotage or other hostile action, or by fire, *flood*, snowstorm, windstorm, tornado, cyclone, drought, earthquake, or other natural causes *and provide for the relief of distressed humans* and livestock *in areas where such conditions prevail whether affecting all or only a portion of the state. These functions include, without limitation*, fire-fighting services, police services, medical and *health services*, rescue, engineering, air-raid warning service, communications, radiological, chemical, and other special weapons of defense, evacuation of persons or livestock from stricken areas, emergency welfare services, emergency transportation, existing or properly assigned functions of plant protection, temporary restoration of public utility services, *and other functions related to civilian* or livestock *protection*, together *with other activities necessary or incidental to the preparation for any carrying out of the foregoing functions* including co-operation with the American Red Cross, the United States armed forces, the Indian service, the United States forest service, or other federal agencies, counties, townships and other local subdivisions of government, persons, firms or corporations." (emphasis added)

 Sovereign immunity is the principle of jurisprudence, that the state cannot be sued unless it has given its consent or has otherwise waived its immunity. *Cuka v. State*, 1963, 80 S.D. 232, 122 N.W.2d 83; 72 Am.Jur.2d, States, Etc., §§ 99, 100; 81A C.J.S. States § 298. A municipal corporation acting within its governmental powers is acting as an agent for the state and partakes in its sovereignty in respect to immunity. *Conway v. Humbert*, 1966, 82 S.D. 317, 145 N.W.2d 524.

The doctrine of sovereign immunity is a principle of common law recognized in Art. III, § 27 of our Constitution. *Conway v. Humbert*, supra; *Wisconsin Granite Co. v.*

*State*, 1929, 54 S.D. 482, 223 N.W. 600. One notable exception to the sovereign immunity of the state and governmental immunity of a municipal corporation is found in Art. VI, § 13 of the South Dakota Constitution, which provides:

"Private property shall not be taken for public use, or damaged, without just compensation, which will be determined according to legal procedure established by the Legislature and according to § 6 of this article. * * *"

The taking of property for public use is also controlled by Art. VI, § 2 of the South Dakota Constitution, which provides:

"No person shall be deprived of * * property without due process of law. * * *"

However, formal actions for the exercise of the power of eminent domain are not always necessary to allow the recovery of compensation.

"Where a state or an agency thereof acting in a sovereign capacity takes or damages private property for public use without (formally) exercising the power of eminent domain, it cannot evade the constitutional provision which guarantees the right to compensation but will be obligated to pay the same as if it had proceeded under that power." *Darnall v. State*, 1961, 79 S.D. 59, 108 N.W.2d 201.

There are three important exceptions to the requirement of compensation where, without the owner's consent, private property is intentionally, purposefully or deliberately taken or damaged for the public use, benefit or convenience. They are the taking or destruction of property (1) during actual warfare;[1] (2) to prevent an imminent public catastrophe; and (3) to abate a public nuisance. In each instance, the power to "take or damage" without

compensation is based upon the public necessity of preventing an impending hazard which threatens the lives, safety, or health of the general public.

The public necessity privilege is an extension of every individual's privilege to take whatever steps appear reasonable to prevent an imminent public disaster. The privilege in an impending disaster is stated in Restatement of Torts, 2d, § 196:

"One is privileged to enter land in the possession of another if it is, or if the actor reasonably believes it to be, necessary for the purpose of averting an imminent public disaster."

See also Prosser, Torts (4th ed.), § 24.

The application of the public necessity privilege to a governmental subdivision is explained in 1 Nichols, Eminent Domain, § 1.43[1] and [2]:

"[1] Action by private individual.

"More closely allied to the power of eminent domain is the power of destruction from necessity. In the case of fire, flood, pestilence or other great public calamity, when immediate action is necessary to save human life or to avert an overwhelming destruction of property, any individual may lawfully enter another's land and destroy his property, real or personal, providing he acts with reasonable judgment.

"* * * The right to destroy life or property for self-preservation differs from eminent domain in that it is an individual right rather than an attribute of sovereignty. When it is exercised by a public officer he must justify his conduct as an individual whose position makes him a natural leader, rather than as an agent of the government. The right is a natural one and requires no statutory sanction; in fact it is doubtful if the

---

1. The right to destroy property in battle is, of course, not applicable here; the doctrine is important in that not every destruction for war purposes is privileged but only when done in the face of impending enemy attack or in actual battle. See *United States v. Pacific R.R. Co.*, 120 U.S. 227, 7 S.Ct. 490, 30 L.Ed. 634; *United States v. Caltex, Inc.*, 344 U.S. 149, 73 S.Ct. 200, 97 L.Ed. 157; *Franco-Italian Packing Co.

*v. United States*, 128 F.Supp. 408, 130 Ct.Cl. 736; 1 Nichols, Eminent Domain, § 1.44; 93 C.J.S. War & National Defense §§ 22, 23. Private property needed for the conduct of a war may be taken, but it is an exercise of eminent domain and there must be compensation. See *United States v. 15.3 Acres of Land, Etc.*, D.C. Penn., 154 F.Supp. 770; 1 Nichols, Eminent Domain, § 1.44[4].

exercise of the right could be constitutionally prohibited, whereas eminent domain requires specific authority for the legislature to warrant its exercise even by municipal corporations or officers of the state.

"[2] Action by public agent.

"If the individual who enters and destroys private property happens to be a public officer whose duty it is to avert an impending calamity, the rights of the owner of the property to compensation are no greater than in the case of a private individual. The most familiar example of the exercise of this right is seen in case of a fire. The neighbors and fireman freely trespass on the adjoining land, and houses are even blown up to prevent the spread of the conflagration. The danger of flood or the existence of a pestilence may call for equally drastic action. However, the permanent appropriation of private property without the payment of compensation therefor cannot be justified under the power.

\* \* \* \* \* \*

"Even in states in which the statutes regulate or specifically authorize destruction of property in the presence of impending calamity, such legislation is not the exercise of a new power, but a recognition and continuation of the old power, and hence is due process of law, and does not affect a taking of property without compensation in the constitutional sense. The right to destroy under such circumstances is a natural right which springs from the *necessity* of the case. Where, therefore, it is sought by statute to *add* to the right or to *create* the right to destroy in case of *emergency* rather than *necessity*, such attempt constitutes an exercise

of the power of eminent domain and compensation must be made."
See also 18 McQuillin, Municipal Corporations, § 53.58.

■ To fall within the privilege, there must be "[a] necessity, extreme, imperative, or overwhelming, [to] constitute such a justification, but mere expediency, or public good, or utility, will not answer." *Hale v. Lawrence*, 1848, 21 N.J.L. 714, 47 Am.Dec. 190. Thus the destruction of sound and substantial buildings has been allowed without due process and without compensation where the destruction or damage was, or reasonably appeared to be, necessary to prevent an impending or imminent public disaster from fire,[2] flood,[3] disease,[4] or riot.[5]

■ Once the impending disaster has passed, the government may not rely upon the doctrine of necessity to justify the subsequent destruction of property. In *Short v. Pierce County*, 1938, 194 Wash. 421, 78 P.2d 610, a concrete revetment along the Payullup River was being washed away during a flood. As the flood waters rose, the county engineer ordered crews onto plaintiff's land to sandbag the revetment. In the process, much of the topsoil was removed and berry bushes and frames on the land were destroyed. The damage was held to be non-compensable because it was done in the face of an impending public calamity. However, when the county crews remained on plaintiff's land for several months after the flood had subsided, the property taken and destroyed in making permanent repairs to the revetment was held compensable as an exercise of eminent domain.

■ Had the Boland property been destroyed during the flood in an attempt to

**2.** *Bowditch v. Boston*, 1879, 101 U.S. 16, 25 L.Ed. 980; *American Print Works v. Lawrence*, 1851, 23 N.J.L. 9, 57 Am.Dec. 420; *Hale v. Lawrence*, 1848, 21 N.J.L. 714, 47 Am.Dec. 190; *Surocco v. Geary*, 1853, 3 Cal. 69, 58 Am.Dec. 385; *Field v. City of Des Moines*, 1874, 39 Iowa 575, 18 Am.Rptr. 46.

**3.** *Short v. Pierce County*, 1938, 194 Wash. 421, 78 P.2d 610; *Atken v. Village of Wells River*, 1898, 70 Vt. 308, 40 A. 829; *McKell v. Spanish*

*Fork City*, 1957, 6 Utah 2d 92, 305 P.2d 1097; *Dudley v. Orange County*, 1962, Fla.App., 137 So.2d 859.

**4.** *Juragua Iron Co. v. United States*, 1909, 212 U.S. 297, 29 S.Ct. 385, 53 L.Ed. 520.

**5.** *National Board of YMCA v. United States*, 1969, 395 U.S. 85, 89 S.Ct. 1511, 23 L.Ed.2d 117.

control the rising waters of Rapid Creek, the destruction would undoubtedly have been justified as a public necessity. The destruction of the property 21 days after the flood waters had subsided cannot be justified as necessary to save lives or property from the flood. If there was an impending disaster, it could only have been that of an epidemic threatening the public health. That is, of course, a fact question which must be answered by the trial court.

■■■ If there was no impending disaster, or the destruction of the Boland property was not reasonably necessary to prevent a disaster, then its destruction could only be justified as an abatement of a public nuisance. The right of a public official to abate a public nuisance is described in Restatement of Torts, 2d, § 202:

"A public officer who by virtue of his office or by statute is authorized to abate a public nuisance, is privileged, at a reasonable time and in a reasonable manner, to enter land in the possession of another for the purpose of abating such a nuisance."

The abatement of a public nuisance does not entitle the owner of the property to compensation; however, he is normally entitled to due process, i. e., formal notice and a hearing, to determine whether the property is in fact a nuisance in most instances. SDCL, Ch. 21–10. A summary abatement is allowed only where (1) the property constitutes a public nuisance that is an imminent hazard to the public health, safety, or welfare, and (2) destruction is the only adequate method eliminating the hazard. 58 Am.Jur.2d, Nuisances, §§ 201, 205; 13 Am. Jur.2d, Buildings, § 41; 39 Am.Jur.2d, Health, § 33; 16 Am.Jur.2d, Constitutional Law, § 264; 1 Nichols, Eminent Domain, § 1.42[15]; McQuillin, Municipal Corpora-

tions, §§ 24.23, et seq; 24.27; 24.238; 24.-561.

"In all such cases the owner is entitled to a hearing at some stage of the proceedings on the question whether his property was, in fact, a nuisance, and if it was not, he is entitled to compensation for its destruction. It may well be a reasonable method and necessary for the public health (or safety) to destroy first and investigate afterward; but if sound and valuable property is destroyed as a result of such necessity, it is taken for the public use in the constitutional sense and the owner is entitled to compensation." 1 Nichols, Eminent Domain, § 1.42[15].

See also 58 Am.Jur.2d, Nuisances, §§ 205–208.

To justify the summary destruction of a public nuisance, the person destroying the property must prove that the property was in fact a nuisance and that the destruction was in fact necessary to abate the nuisance. *Fields v. Stokely,* 1882, 99 Pa. 306, 44 Am. Rptr. 109; *Eckhardt v. City of Buffalo,* 1897, 19 App.Div. 1, 46 N.Y.S. 204, affirmed 156 N.Y. 658, 50 N.E. 1116; *United States Illuminating Co. v. Grant,* 1889, 55 Hun. 222, 7 N.Y.S. 788; *Gaskins v. People,* 1928, 84 Colo. 582, 272 P. 662. See also Restatement of Torts, 2d, § 202, comment e; 16 Am.Jur.2d, Constitutional Law, § 368.

■■■ Thus the summary abatement of a public nuisance has been upheld in the destruction of property containing disease germs [6] or a dangerous condition after partial destruction by fire.[7] However, if there is no notice and hearing before the seizure and destruction of the property, then the owner is entitled to a hearing after the destruction to determine whether the property was in fact a nuisance, *North Ameri-*

---

6. *Meeker v. Van Rensselaer,* 1836, 15 Wend. 397, 12 N.Y.Com.Rep. 395 (building); *Sings v. City of Joliet,* 1908, 237 Ill. 300, 86 N.E. 663 (building); *Elliott v. Kalkaska Sup'rs,* 1885, 58 Mich. 452, 25 N.W. 461 (clothing); *Prichard v. Commissioners of Morganton,* 1900, 126 N.C. 908, 36 S.E. 353 (house); *Corneal v. State Plant Board,* 1957, Fla., 95 So.2d 1 (diseased trees); *Campoamor v. State Live Stock Sani-*

tary Board, 1938, 136 Fla. 451, 182 So. 277 (diseased cattle); *North American Cold Storage Co. v. Chicago,* 211 U.S. 306, 29 S.Ct. 101, 53 L.Ed. 195 (foodstuff); *Deems v. Mayor and City Council,* 1894, 80 Md. 164, 30 A. 648 (milk).

7. *Lux v. Milwaukee Mechanics' Ins. Co.,* 1929, 322 Mo. 342, 15 S.W.2d 343.

*can Cold Storage Co. v. Chicago,* 211 U.S. 306, 29 S.Ct. 101, 53 L.Ed. 195, and whether such destruction was, in fact, necessary to abate the nuisance. *Sings v. City of Joliet,* 1908, 237 Ill. 300, 86 N.E. 663.

If property is intentionally, purposefully and deliberately destroyed or damaged for the public use, benefit or convenience by a public officer in the performance of his official duties, the governmental entity must compensate the owner of the property unless the destruction was to prevent a public disaster or a summary abatement of a nuisance imminently hazardous to the public health, safety or welfare. Any statute which attempts to expand the immunity of the governmental entities for destruction of property beyond public necessity and summary abatement would violate the provisions of Art. VI, § 13, South Dakota Constitution.

We do not find, however, that SDCL 33–15–38 attempted to grant the state, its subdivisions or its agents immunity from liability for intentional, purposeful or deliberate destruction of property in situations other than public necessity. Rather, it appears from the language of the statute that the statute intended to reiterate the common law sovereign immunity of the state for damages caused by the negligence of its agents while performing a governmental function, i. e., emergency assistance. See, e. g., *Bundy v. Peugeot,* 1961, 222 N.Y.S.2d 576.

The trial court's decision that SDCL 33–15–38 granted sovereign immunity for any and all damage to property (even if intentional) during civil defense activities was error. We therefore reverse and remand this matter for further proceedings to allow the trial court to make findings as to:

(1) whether on the day of destruction of the Boland property there was an imminent and impending peril to the public in the Rapid City area, and, if so, was it necessary or did it reasonably appear to be necessary, to destroy the Boland property to prevent the spread of such peril; or

(2) whether on the date of its destruction the Boland property was a public nuisance which was imminently hazardous to the public health, safety or welfare, and, if so, whether the destruction of the Boland property was the only adequate method of abating the nuisance created by the property.

If the answers to these questions are in the negative, then the Bolands must receive compensation, for in effect their property was taken by an exercise of the power of eminent domain.

All the Justices concur.