Vincent H. BOLAND, Edna Kingsbury
Boland and Combined Cases,
Plaintiffs and Appellees,

v.

CITY OF RAPID CITY, a Municipal Corporation and County of Pennington, Defendants and Third-Party Plaintiffs and Appellants,

v.

STATE of South Dakota, Third-Party
Defendant and Appellee.

Nos. 13121–13131, 13204.

Supreme Court of South Dakota.

Argued Jan. 14, 1981.

Decided Feb. 3, 1982.

Rehearing Denied March 26, 1982.

George A. Bangs of Bangs, McCullen, Butler, Foye & Simmons, Rapid City, for plaintiffs and appellees.

Horace R. Jackson of Lynn, Jackson, Shultz & Lebrun, Rapid City, for defendants and third-party plaintiffs and appellants.

Camron Hoseck, Asst. Atty. Gen., Pierre, for third-party defendant and appellee; Mark V. Meierhenry, Atty. Gen., Pierre, on the brief.

MORGAN, Justice.

This action arose from the destruction of appellees' property by appellants, Rapid City and Pennington County, under "Operation Bulldozer," a cleanup operation following the 1972 flood which inundated a large part of the Rapid City area. The Circuit Court dismissed appellees' action against the State, but upheld their actions against appellants. The trial court also denied appellees' request for attorney fees. This ap-

peal concerns appellants' liability for the destruction of appellees' property and the trial court's denial of appellees' request for attorney fees. We affirm.

This case was before us on another occasion when some of the appellees appealed an adverse decision on their counterclaim to the City's condemnation action. The City sought condemnation of a lot made vacant by removal of the building under the auspices of "Operation Bulldozer." Our decision, *City of Rapid City v. Boland*, 271 N.W.2d 60, 68 (S.D.1978) (*Boland I*), held,

> If property is intentionally, purposefully and deliberately destroyed or damaged for the public use, benefit or convenience by a public officer in the performance of his official duties, the governmental entity must compensate the owner of the property unless the destruction was to prevent a public disaster or a summary abatement of a nuisance imminently hazardous to the public health, safety or welfare.

We reversed the trial court and remanded for findings on,

> "Whether on the day of destruction of the [appellees'] property there was an imminent and impending peril to the public in the Rapid City area, and, if so, was it necessary or did it reasonably appear to be necessary, to destroy the [appellees'] property to prevent the spread of such peril[?]"[1]

We will not reiterate the facts detailed in *Boland I*, 271 N.W.2d at 62, except as necessary to this decision.

On remand the trial court made findings of fact and conclusions of law incorporating its memorandum decision and entered individual judgments for each case. Appellants raise some thirteen issues in their appeal, some of which we deal with conjunctively. *Boland I*, however, framed the principal legal issue contested in this appeal where that case said, "If the answers to these questions are in the negative, then the Bolands must receive compensation, for in effect their property was taken by an exercise of the power of eminent domain." *Boland I*, 271 N.W.2d at 68.

■ To come within the stricture of *Boland I* and avoid compensating appellees, appellants contend that an imminent and impending peril of epidemic existed, and that it was immediately necessary to clear the area of debris to prevent the epidemic. They urge that the Governor's declaration of emergency is conclusive upon the courts as to determining the existence and extent of the emergency. In this respect, they further argue that the destruction of the private property was a valid exercise of police power where health officials had found a general threat of disease and plague.

These arguments simply repeat issues already decided by *Boland I*. On remand, the trial court answered the first issue of appellant's argument in the affirmative.

> [A]t the time these properties were destroyed by Operation Bulldozer, there was an imminent and impending peril to the public health in the Rapid City area from disease, necessitating debris removal;

The trial court, however, answered the second question of the argument in the negative.

> That the properties, subject to this lawsuit were not debris and were not destroyed to alleviate the public health problems;
>
> That the structures destroyed in the instant lawsuit were taken primarily because of their lack of structural integrity;
>
> That it was not necessary, nor did it reasonably appear to be necessary, to destroy these structures to prevent the spread of disease.

---

1. The decision also remanded for findings "or (2) whether on the date of its destruction the [appellees'] property was a public nuisance which was imminently hazardous to the public health, safety or welfare, and, if so, whether the destruction of the [appellees'] property was the only adequate method of abating the nuisance created by the property." *City of Rapid City v. Boland*, 271 N.W.2d 60, 68 (S.D.1978). Appellants, however, in their brief disclaimed any reliance and theory of nuisance despite their suggestion at oral argument.

"It is not the function of this Court to question the lower court's findings of fact unless such factual determinations are 'clearly erroneous.' " *Pudwill v. Brown,* 294 N.W.2d 790, 792 (S.D.1980); SDCL 15–6–52(a). "A trial court's rulings and decisions are presumed to be correct and this court will not seek reasons to reverse. A trial court's findings of fact are also presumptively correct and the burden is upon appellant to show error in the findings." *Cuka v. Jamesville Hutterian Mut. Soc.,* 294 N.W.2d 419, 421 (S.D.1980) (citations omitted). We are unable to say that the trial court's findings were clearly erroneous. Indeed, the record is replete with evidence to support the trial court's findings.

> The [building inspection] form provided for the individual evaluation of the roof, floor joists, foundation, interior walls, and exterior walls, and whether the condition of the structure constituted a hazard. * * *
>
> The form was directed at the structural soundness of the building. It was not designed to measure a building in relationship to possible epidemic or other public calamity. * * *
>
> There was no unanimity among the witnesses as to the proper use of the inspection form. Some inspection teams did not use it at all. The three-man inspection teams were apparently vested with unreviewable authority to order the destruction of any building in the flood area . . . . the decision to demolish [appellees'] buildings was made on the basis of structural soundness of the buildings, not on the basis of any theory of prevention of epidemic. * * *
>
> The court concludes that whatever possibility of epidemic existed, it was not so imminent and impending as to justify the destruction of repairable buildings. The court is not convinced that the destruction of [appellees'] buildings served in any meaningful or significant manner to alleviate the possibility of epidemic.

We hold that the evidence supports the trial court's findings of fact that the instant properties, destroyed by "Operation Bulldozer," were destroyed by the City and the County in the exercise of the power of eminent domain. The property owners are entitled to just compensation for these properties.

This appeal also raises a most interesting question: whether the State owes the duty to compensate for the taking of property where the Governor exercised the emergency powers of SDCL ch. 33–15? The trial court found that the Governor did not assume control over local civil defense functions. Instead, the State's role was limited to advising local governmental units.

■ Since this case concerns joint efforts by state and local governments which resulted in an exercise of eminent domain powers, it is analogous to *Bogue v. Clay County,* 75 S.D. 140, 60 N.W.2d 218 (1953), and *Hurley v. Rapid City,* 80 S.D. 180, 121 N.W.2d 21 (1963). In *Bogue,* the county was liable for compensation because the state statute expressly declared that the State was the county's agent for purposes of road construction. *Hurley* first sued the City of Rapid City. On appeal, the court distinguished *Bogue* because a similar statute was lacking. It also denied relief, because the work was fully controlled, initiated and completed by the State Highway Commission. *Id.,* 121 N.W.2d at 25. Later, Hurley prevailed in a suit against the state. *Hurley v. State,* 82 S.D. 156, 143 N.W.2d 722 (1966). Unlike *Bogue,* the *Hurley* decision held the state liable for compensation to landowners whose property was taken for road construction. Although these cases reach different results, their rule is consistent: where local government is an agent of state government, in law or fact, the state is liable for claims made under the just compensation clause of Article VI, § 13 of the South Dakota Constitution. See also, *Iseman Corporation v. Rapid City,* 81 S.D. 534, 137 N.W.2d 885, 887 (1965); *Austin v. Hennepin County,* 130 Minn. 359, 153 N.W. 738, 740 (1915); *Gruntorad v. Hughes Brothers,* 161 Neb. 358, 73 N.W.2d 700, 706–707 (1955); *Henry Shenk Co. v. City of Erie,* 352 Pa. 481, 43 A.2d 99, 100 (1945).

■ South Dakota Codified Laws ch. 33–15 envisions joint participation by local, state and federal governments in emergency and disaster services. SDCL 33–15–2, 3, 8, 8.1. But, neither participant is expressly made the agent of the other. Therefore, we must look to the facts and circumstances surrounding "Operation Bulldozer."

In this regard the trial court noted in its memorandum opinion,

City and county government was functional almost immediately and remained functional throughout the entire period. The State of South Dakota and its officers and employees served and assisted only in a liaison and advisory capacity, making their abilities and resources available to city and county government. The State did not authorize, control or participate in the destruction of the plaintiffs' structures. State officials did not direct, order or control local governing officials of the city or county governments. The State exercised no control over the decision-making authority nor did the State have any voting authority on city or county government. Operation bulldozer was brought into existence as a result of city and county governmental action. The Governor of South Dakota did not assume control over local governmental operations as a result of his disaster declaration of June 10, 1972 or his declaration of necessity of June 12, 1972. The State Declarations are based upon the concept of assisting local governmental entities, and state assistance had been requested by city and county officials.

The contractors involved in the destruction of these properties as a result of operation bulldozer were acting under the direction and control of the contracting governmental authority in accord with instructions received by the local governing entities, their officers, agents, or employees.

The trial court's findings in this regard were not clearly erroneous. The State does not owe a duty to compensate the appellees under Article VI, § 13 of the South Dakota Constitution.

■ Another issue on appeal tests the admissibility of appellees' expert evidence of value because he did not base his opinion on entirely comparable transactions. An expert witness must specify the circumstantial information from which an opinion is derived. SDCL 19–15–4. In condemnation suits the trial court is given great discretion in receiving relevant evidence of value. *Neb. Elec. Generation & Trans. Co-op. v. Markus,* 90 S.D. 238, 241 N.W.2d 142, 150 (1976). For instance, strictly comparable transactions are unnecessary in condemnation cases. *Id.,* 241 N.W.2d at 150. Similarly, an expert need not base his opinion upon traditional valuation techniques, See, e.g., *State Highway Commission v. Hayes Estate,* 82 S.D. 27, 140 N.W.2d 680 (1966); *Samuelson v. Salamanca Urban Renewal Agency,* 34 A.D.2d 369, 311 N.Y.S.2d 558 (1970), because these techniques are simply infeasible. The properties were unavailable for comparison because they no longer existed at the time of trial. Additionally, they were obviously unrentable due to flood damage. Market data on a destroyed house previously damaged by a flood is virtually unattainable.

The trial judge was aware of this problem in valuation. The memorandum opinion acknowledged that he had "allowed considerable latitude on the damages evidenced." The trial court correctly stated the rule that "just compensation" was the full market value at the time of the taking. It then pointed out that extraordinary circumstances were prevalent in the Rapid City area which made the rule difficult to apply. The memorandum opinion recognized the testimony of the expert witnesses for both sides as opposed to the evidence of value adduced from the property owners. The trial court also emphasized the testimony of contractors and carpenters who had actually viewed the individual structures. Furthermore, in only one case did the trial court grant damages as high as the valuation of appellants' expert, and even in that instance, the award was substantially below the landowners' estimated value.

■ Considering the circumstances of this case, the trial court's methodology was

more than adequate, particularly inasmuch as it conscientiously attempted to view the market value in the light of the depressed status engendered by the flood. We hold that the trial court did not commit error in admitting the testimony of appellees' expert witness.

■ We next examine appellants' argument that the trial court erred in placing the burden of proof on them. Again, *Boland I*, 271 N.W.2d at 67, states, "To justify the summary destruction of a public nuisance, the person destroying the property must prove that the property was in fact a nuisance and that the destruction was in fact necessary to abate the nuisance." We cannot conceive, nor does counsel supply, a rationale justifying a different allocation of the burden simply because the appellants eschewed public nuisance and relied solely on prevention of an imminent public catastrophe as the affirmative defense. We hold that the trial court correctly applied the law laid down in *Boland I.*

■ The Jeffersons initiated their action to recover in April of 1979, more than six years after the alleged wrongful destruction of their property. Appellants argue that the action is barred by the six-year statute of limitations for trespass and conversion. SDCL 15–2–13(3) and (4). Jeffersons claim that the twenty-year statute regarding adverse possession is applicable under our decisions in *Faulk v. Missouri River & N.W. Ry. Co.,* 28 S.D. 1, 132 N.W. 233 (1911) and *Johnson v. Hawthorne Ditch Co.,* 32 S.D. 499, 143 N.W. 959 (1913).

Again, appellants attempt to relitigate *Boland I.* They cite a portion of the trial judge's memorandum in *Boland I* opinion finding that the destruction of the appellees' dwelling was under police powers, not condemnation. Appellants argue that this is the law because that finding was not reversed. We disagree. The trial court's memorandum opinion in *Boland I* was not incorporated in its findings of fact and conclusions of law and, therefore, was never

before us on review. We are not bound by any failure to specifically overrule an issue that was not before us for review.

Appellants attempt to distinguish the Jefferson claim from settled law that says that the twenty-year statute applies to Article VI, § 13 of the South Dakota Constitution. They argue that the taking must be continuous to bring the action within the law of eminent domain. Although Article VI, § 13, contains the same language as the Fifth Amendment to the United States Constitution,[2] our state provision is broader.[3] It guarantees compensation for property rights *damaged* in the name of the public. Surely, the lesser guarantees of the federal constitution are included in the greater guarantees of the South Dakota Constitution.

The United States Supreme Court has stated that a partial or intermittent divesting of property falls within the Fifth Amendment. *United States v. Cress,* 243 U.S. 316, 328–329, 37 S.Ct. 380, 385, 61 L.Ed. 746 (1917). Compensation is an express condition of the Fifth Amendment which creates a right to recovery for the taking or damage regardless of the common-law tort theory which may also support Jeffersons' claim. *Hurley v. State,* 143 N.W.2d at 729; *Gruntorad v. Hughes Brothers,* 73 N.W.2d at 707; *Coates v. United States,* 93 F.Supp. 637, 639 (Ct.Cl.1950); Cf. *Johnson v. Hawthorne Ditch Company,* 143 N.W. at 959; *Faulk v. Missouri River & N.W. Ry. Co.,* 132 N.W. at 233. The twenty-year statute of limitations applies to Jeffersons' claim against the County regardless of the underlying tort claim.

Appellants allege that the trial court erred in allowing damages on the Stoltz and Niewiedomski claims because the owners had conveyed their property to the City by deed, thus, averting condemnation. Appellants cite *Larsen v. State,* 90 S.D. 146, 238 N.W.2d 684, 686 (1976), for the proposition that the effect of the conveyance of land for a public purpose vests in the public body the same rights as though the land had

---

**2.** "[N]or shall private property be taken for public use without just compensation."

**3.** "Private property shall not be taken for public use, or damaged, without just compensation . . . ."

been acquired by condemnation. *Larsen* quoted *Hamilton v. City of Bismarck*, 71 N.D. 321, 300 N.W. 631, 634 (1941), which continued, "The conveyance will be held to be a release of all damages which would be presumed to be included in the award of damages if the property had been condemned."

The instant cases are easily distinguished from both *Larsen* and *Hamilton*. *Larsen* dealt with a claim for additional damages for an alley closed due to a taking of an adjacent right-of-way. The taking itself occasioned the additional damage to the condemnee's property. There, the court held that the condemnee had acquiesced to the closing in the right-of-way conveyance agreement. In *Hamilton* the claim was based on damages caused by overflow of a city sewer installed through an exercise of eminent domain. The court held that the damages, which arose from the condemnation, had been fully satisfied under that contract and that no right to damages accrued to the subsequent owner of property. In the cases before us, however, the damage to the structures had occurred before the negotiation and transfer. The structures had been bulldozed away. All that remained was a claim for damages, a chose in action. Black's Law Dictionary, 4th Edition. It is difficult to see how homes that did not exist at the time of conveyance could be conveyed by warranty deed.

■ In essence, appellants' claim is that the warranty deed operated as a release of the respective causes of action. A release is a contract and as such the intention of the parties governs. *Maryland Cas. Co. v. Delzer*, 283 N.W.2d 244 (S.D.1979); SDCL 20–7–10. Since the appellants argue that the deeds released their obligations to appellees, appellants bear the burden of proof on the issue of intent. *Id.* at 245.

■ Viewing the conveyances separately, we look first at the Stoltz property. There, the trial court was clearly correct because the counsel for appellants stipulated that the consideration paid Stoltz did not include the house. In light of that record, appellants are ill-situated to claim that the Stoltz deed was intended as a release.

■ The Niewiedomskis' case is not so clear cut. As we have noted, however, the burden was on the appellants to establish the release. The trial court determined that appellants failed to meet their burden. We cannot say that it was clearly erroneous. Even using appellants' authority, *Larsen*, 283 N.W.2d at 684, any suggestion that the award of damages for the structure "would be presumed to be included in the award of damages, if the property had been condemned" is misplaced. Of the eleven cases before us, eight are condemnation actions and in each and every one appellants strenuously fought the award of any damages for destruction of the structures by "Operation Bulldozer." We hold that the trial court was not in error with respect to the effect of the warranty deeds.

■ Appellees cross appeal from the trial court's denial of attorneys' fees requested under the provisions of 42 U.S.C. § 1988. We affirm.

While appellees pleaded this action in state court on state law, specifically reserving to federal court any federal questions, we recognize that under the decisions of the United States Supreme Court the provisions of section 1988 apply to proper state actions. *Maine v. Thiboutot*, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980). We decide that this is not a proper state action within section 1988. Appellees argue,

1) that § 1988 is applicable in any action or proceeding to enforce a provision of § 1983;

2) that § 1983 creates a liability in every person who, under color any statute, ordinance, regulation, custom or usage—subjects—any citizen—to the deprivation of any rights—secured by the constitution and laws—to the party injured in an action at law—or other proper proceeding for redress; and

3) that taking or damaging private property for public use without just compensation is a violation of the appellees' constitutional rights under the Fifth Amendment to the United States Constitution and Article VI, § 13 of the South Dakota Constitution.

We look first to the history of the Civil Rights Attorney's Fee Awards Act. As appellee correctly points out, the amendment was generated by the United States Supreme Court decision in *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), where the Court refused to tax attorneys' fees based on the "private attorney general" approach, leaving it to Congress to authorize such an exception to the so-called "American rule" that attorneys' fees are not ordinarily recoverable in the absence of statutory authorization.[4] The purpose of section 1988 "is to remedy anomalous gaps in our civil rights laws created by the United States Supreme Court's recent decision in *Alyeska Pipeline*—and to achieve consistency in our civil rights laws." 5 U.S.C. Congressional & Administrative News, 94th Congress, Second Session, 1976, 5908, at 5909. As the Senate Report indicates, the idea of private attorney generals is not a new one, nor are attorneys' fees a new remedy. Congress has commonly authorized attorneys' fees in laws under which private attorney generals play a significant role in enforcing its policies. *Id.* at 5910. "Before—*Alyeska*—many lower federal courts throughout the nation—following congressional recognition in the newer statutes of the 'private attorney general' concept, were exercising their traditional equity powers to award attorneys' fees under early civil rights laws as well." *Id.* at 5911. "This bill, [section 1988], is an appropriate response to the *Alyeska* decision. It is limited to cases arising under our civil rights laws, a category of cases in which attorneys' fees have been traditionally regarded as appropriate." *Id.*, at 5912.

As we review the cases indexed under section 1988, the rights being enforced are rights subject to 42 U.S.C. § 1983 actions, such as voting rights, jury discrimination, school desegregations and equal protection. *Derheim v. Hennepin County Bureau of Social Services*, 524 F.Supp. 1321 (D.C.Minn. 1981). We do not view the appellees' claims

as analogous claims. They are not taken to vindicate a broad public interest. Rather, they are taken to enforce a private property right. Counsel are not private attorney generals, but act as private counsel seeking substantial monetary damages for their clients' injuries, from which they will be compensated. Were we not to take such a view, every artful counsel could dress up his dog bite case as within sections 1983 and 1988. As Chief Judge McDevitt of the United States District Court in Minnesota said,

> No intentional deprivations of civil rights were alleged, nor is plaintiff the member of a distinct, oppressed minority group. No injunctions were sought to stop illegal police practices, nor was the public interest vindicated in any way other than in the indirect manner of most common law negligence cases.

*Martin v. Hancock*, 466 F.Supp. 454, 456 (D.Minn.1979).

Appellees do not persuade us that *Maher v. Gagne*, 448 U.S. 122, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980), holds otherwise. *Maher* and *Maine v. Thiboutot*, 448 U.S. at 1, 100 S.Ct. at 2502, decided the same day, both held sections 1983 and 1988 applicable to Social Security Act violations. Both cases specifically considered actions based on federal law, *Maine* in a state court proceeding and *Maher* in federal court. Wise or otherwise,[5] the Supreme Court has apparently seen fit to extend sections 1983 and 1988 to the deprivation of any federal statutory right, e.g., Social Security Act and possibly other federal legislation involving joint regulatory endeavors, resource management and grant programs. We do not believe that this expansion of sections 1983 and 1988 includes condemnation and inverse condemnation under color of state law.

All the Justices concur.

---

4. This court has always subscribed to the American Rule.

5. The strong dissent by Justice Powell suggests it was otherwise.