305 P.2d 1097

Rebecca McKELL, Plaintiff and Appellant,

v.

SPANISH FORK CITY, a Municipal Corporation, Marcellus Nielson, J. W. Anderson, Ed. M. Beck, Arthur Grotegut, Bert D. Isaac, J. Rowe Lewis, and Lindsey B. Snell et al., Defendants and Respondents.

No. 8494.

Supreme Court of Utah.

Jan. 22, 1957.

Elias Hansen, Salt Lake City, for appellant.

R. H. Andrus, Spanish Fork, Christenson, Paulson & Novak, Provo, for respondents.

CROCKETT, Justice.

This action was commenced by A. T. McKell against Spanish Fork City, Utah County, the State Road Commission and certain officers and employees. Before it came on for trial, A. T. McKell died and his surviving wife Rebecca McKell was substituted as plaintiff

Recovery is sought for damages to land, improvements, and personal property on a portion of the McKell farm resulting from flood control measures taken by the defendants to control the water drainage usually carried by the Spanish Fork River during the extraordinary runoff which occurred in 1952. The winter of 1951–2 had been one of unusually heavy snowfall which remained in the mountain water sheds longer than usual due to a late cold spring. This was followed by an abrupt change into an unseasonal warm spell producing an unprecedented runoff and flooding of mountain streams and pediments throughout the state.

The exceptional situation made it apparent that flooding in the area was imminent. Officials of Spanish Fork City, Utah County, and the State Road Commission together with owners of property near the river began planning concerted action to forestall and minimize flood damage. An understanding was reached whereby those governmental units would undertake to enlarge the river bed to contain the waters in the channel and otherwise control them. Incidental to this, they required adjacent property owners, including A. T. McKell, to sign a release from liability for damage that might result to property in connection with the work. Due to the wording of the release, there is serious question whether it would preclude the present plaintiff, Mrs. Rebecca McKell, from recovery in this action. In view of the considerations, later discussed herein, which we find determinative, it is unnecessary to resolve that matter.

The McKell property is situated eastward from Spanish Fork between the town and the mountains and lies a short distance north of the Spanish Fork River which courses out of the canyon of the same name. As the flood waters overflowed above the McKell property, they threatened to inundate the whole area and damage several properties: a public school and a seminary building, a railroad bridge and trestle, the main arterial north-south highway of the state (U.S. 91), a large concrete bridge structure and other lands and residences in the northeast part of the city and adjacent thereto. In order to prevent flooding and damages to the properties just mentioned the defendants used an existing gravel road running eastward from the northeast corner of the plaintiff's land as a basis upon which to raise a dyke. This admittedly caused greater flooding on the McKell property than otherwise would have occured, gouging out a large gulley in it, destroying part of a corral, feedmanger, fence and carrying away some farm equipment.

After the commencement of this suit, a stipulation was entered into by the parties whereby Utah County and the state of Utah each paid to McKell $2,000 to compensate in part for the damage thus caused by the diversion of water across his land. In consideration of the $4,000 so paid, the action was dismissed as to those defendants and the right expressly reserved to litigate his right to recover against Spanish Fork City and its officers.

A trial by jury resulted in a verdict for the plaintiff against Spanish Fork City in the amount of $2,072. This the court set aside and entered judgment of no cause of action, from which plaintiff appeals.

One of the bases advanced in justification of the action of the trial court is that under the emergency which existed the flood water was a "common enemy" against which property owners could protect themselves by individual or collective action. This doctrine has been recognized since early times in the English law. The courts held that flooding of the sea was a common enemy against which necessary measures could be taken as a matter of preservation of property and self without liability for resultant damage to others.[1]

In this country the rule has been applied to navigable rivers subject to extensive overflow.[2] However, the principle that a riparian owner may protect his property against flooding when to do so will cause damage to others has not received universal acceptance. Some courts hold to the contrary as to floods of an *ordinary* nature,[3] while others permit such action on the ground that even ordinary flood waters are a common enemy.[4] Others reach a similar result upon the theory that waters flooding beyond the natural channel of a stream are surface waters and subject to control under the common enemy theory and permit each landowner to protect himself as best he can.[5]

However, it is generally recognized that riparian owners may embank and protect their lands against the overflow of *extraordinary* floods, even though damage to the lands of others is caused thereby.[6] An extraordinary flood is one which is not foreshadowed by the usual course of nature, and is of such magnitude and de-

1. Rex v. Commissioner, 8 B. & C. 355.

2. Lamb v. Reclamation Dist., 73 Cal. 125, 14 P. 625, and cases cited therein.

3. Keck v. Venghause, 127 Iowa 529, 103 N.W. 773; Fort Worth Improvement District No. 1 v. Fort Worth, 106 Tex. 148, 158 S.W. 164, 48 L.R.A.,N.S., 994; 16 A.L.R. 629.

4. Southern Pacific Company v. Proebstel, Ariz., 150 P.2d 81; Horton v. Goodenough, 184 Cal. 451, 194 P. 34.

5. De Ruwe v. Morrison, 28 Wash.2d 797, 184 P.2d 273; Singleton v. Atcheson, T. & S. F. Ry. Co., 67 Kan. 284, 72 P. 786.

6. Cubbins v. Mississippi River Commission, 241 U.S. 351, 36 S.Ct. 671, 60 L. Ed. 1041; 56 Am.Jur., Waters, Sec. 99; 16 A.L.R. 632.

structiveness as could not have been anticipated or provided against by the exercise of ordinary foresight.[7] The privilege to embank against floods, whether ordinary or extraordinary, is qualified to the extent that the owner who undertakes protective measures must not obstruct the flow of a natural water course, and he is liable for damage resulting to adjacent landowners if he is negligent in erecting his protective devices.

From the facts here it is clear that we are not concerned with the rules which pertain to surface waters in the commonly accepted meaning of that term in adjudications of this type. That term as so used means water diffused over the surface of the ground and derived generally from falling rains or melting snow, and it continues to be such until it reaches well defined channels wherein it customarily flows at which time it becomes part of a stream.[8] Once part of a stream, it does not again become surface water simply because if overflows the banks. Water which continues to flow in the same direction even though outside the banks, and which returns to the channel upon the subsidence of the flood is part of a running stream and it loses its character as such only when it spreads out over the open country, settles in lakes or pools, or finds some other outlet.[9]

It being unnecessary, therefore, to concern ourselves with the problems pertaining to surface water, a pertinent issue is whether the flood in question was an ordinary or an extraordinary flood, and the resultant effect of our conclusion upon the right of the plaintiff to recover. The evidence introduced at the trial to the effect that the volume of water in the Spanish Fork River during the period of maximum runoff in the spring of 1952 was 3500 second feet, which is more than double the worst flood previously known to the river, indicates that the court could very well regard it as an extraordinary flood.

The rule cited above, which allows the owner of lands threatened by the waters of an extraordinary flood to erect defensive barriers without liability to adjoining landowners whose lands may be damaged thereby, is supported not only by the weight of authority but by sound reasoning as well. To impose liability for such damage would be to leave property holders to the mercy of the elements and compel surrender to the force of rampant waters. Contrariwise, to permit protective measures allows conduct which must be expected in the face of danger in accord with the instinct of self-preservation and the natural desire to protect one's family and property. To meet the threat of unforeseeable calamities

7. Wellman v. Kelley, Or., 252 P.2d 816.

8. Id.

9. Broadway Mfg. Co. v. Leavenworth Terminal Ry. & Bridge Co., 81 Kan. 616, 106 P. 1034, 28 L.R.A.,N.S., 156.

it is essential that people, individually, jointly, or through governmental agencies, have reasonable freedom of action to combat against such disasters. This tends toward the maximum protection of threatened lives and property. It likewise finds support in sound public policy by encouraging the cultivation and improvement of property which may otherwise be neglected because of some remote possibility of flooding.

It is indeed regrettable that such damages did result to the plaintiff's property. But the flood itself was a great misfortune to everyone concerned. It must be expected in an organized society that collective efforts to cope with adversities may result in serious damage or sacrifice to the property of some, or that other onerous burdens must be borne, even to the extent of sacrificing the lives of some individuals for the common welfare. Were it not so, defenses against such things would be impossible. The defendants in this case did not transgress the bounds of law in following their purpose of providing the maximum protection of the threatened properties so long as they did not obstruct or divert the course of a natural stream nor commit any wilful or negligent injury to the plaintiff in doing so. The road appears to have been the logical and most effective location for an embankment against the waters and there was no way the damage to the McKell property could have been prevented consistent with a plan to protect threatened properties. There is nothing to indicate that the defendants were in any way negligent in connection with the placement or construction of the barrier. Nor can it be said that they were at fault in their failure to anticipate the magnitude of the flood waters because the flooding was far beyond anything that reasonably might have been anticipated even for a flood.

Inasmuch as the ruling of the trial court that the city of Spanish Fork could not be held liable for damages to plaintiff's land resulting from flood control measures it undertook on behalf of the residents of the locality is justified on the ground that the extraordinary flood constituted a common enemy against which it could, in due care, take protective measures without liability to others damaged thereby, it is not necessary for us to consider whether it was protected from liability by the terms of the release, above referred to, nor the question of sovereign immunity.[10]

Affirmed. Costs to respondent.

McDONOUGH, C. J., and WADE, WORTHEN, and HENRIOD, JJ., concur.

10. See Ramirez v. Ogden City, 3 Utah 2d 102, 279 P.2d 463, 47 A.L.R.2d 539; Davis v. Provo City Corp., 1 Utah 2d 244, 265 P.2d 415.