Ron DOUGHERTY and Judith A. Dougherty,
his wife, Plaintiffs and Respondents,

v.

CALIFORNIA–PACIFIC UTILITIES COM-
PANY, a corporation, Defend-
ant and Appellant.

No. 13854.

Supreme Court of Utah.

Feb. 24, 1976.

Durham Morris, and Joseph E. Jackson, of Cline, Jackson & Mayer, Cedar City, for defendant and appellant.

Patrick H. Fenton, Cedar City, for plaintiffs and respondents.

CROCKETT, Justice:

Ronald and Judith A. Dougherty sued California-Pacific Utilities Company, to recover for damages for the flooding of their home and adjuncts thereto by the overflow of defendant's canal. Trial to the court resulted in findings and judgment in favor of the plaintiffs in the amount of $896.27. The defendant appeals, contending: that the evidence does not support the finding that it was negligent, nor that it proximately caused the plaintiffs' damage; and also that the plaintiffs were negligent themselves in causing such damage.

Defendant, California-Pacific Utilities Company (formerly Southern Utah Power Company) has its hydroelectric plant No. 2 alongside the Santa Clara River near Veyo, in Pine Valley, Washington County. The canal diverts water from the river about three and a half miles upstream from defendant's plant and moves it down to a forebay (a small reservoir); thence through a penstock down to the turbines which supply the power for generating electricity.

There are four means of control of the volume of water in the canal. The first is at the point of diversion from the river, which allows up to the maximum of 16 second feet to flow into the canal. The second is another control arrangement, which is said to be "a considerable distance" above the plaintiffs' property. Its purpose is stated to be to "permit water to escape from the canal" in the event of an ice jam (or we suppose any other difficulty), which has sometimes been used as occasion required. The third is located in the forebay which impounds the water just above the defendant's power plant. There is a spillway along its east (downhill) side; there are five or six planks, that is, two by sixes, about 14 feet long, which can be removed in order to release the water from the forebay, to run back down into the river. The fourth is the outlet of the end of the penstock, which can be opened to ten inches in diameter.

In March of 1971, the plaintiffs moved into their partially completed home which they had built on a tract of land lying just eastward of the canal and about 2,000 feet upstream from the defendant's plant. Nearby they had drilled a well for culinary water which was uncapped at the time. On August 8, 1971, an unusually severe rain and hailstorm occurred. It was of such intensity that 1.72 inches fell in about two hours and drenched the whole area, including the hillside to the west, from whence water coursed down and into the canal. The canal was so full that the water overflowed its eastern bank and down onto the plaintiffs' property causing various damages, including the ruining of their well and pump, which it cost $663.07 to replace, and other damages aggregating the total of the judgment of $896.27. The defendant does not complain as to the amount of damages.

Defendant's first argument that the plaintiffs' damage cannot properly be attributable to any negligence on its part is that the storm was of such unexpected and unusual severity that it should be regarded as "an act of God" which it had no responsibility to safeguard against and for whose damage it could not be held liable. We

have no disagreement with the argument of the defendant that if the occurrence was in fact "an act of God" they should not be held liable therefor.[1] Whether an occurrence should be so classified as "an act of God" depends upon whether the storm was of such magnitude and severity that it was not reasonably to be foreseen and guarded against by the traditional, reasonable and prudent man under the circumstances.[2] A preliminary question is whether this storm should be so classified. Both sides presented some evidence and made their respective contentions on this issue. They agree that cloudbursts of considerable magnitude occasionally fall in that area; and the plaintiff presented some records indicating that on certain other dates in the past there had been comparable amounts of rainfall. On this issue it is sufficient to say that upon conflicting evidence the trial court rejected the defendant's contention.

It is further pertinent to · observe that even if the storm had been of such a nature as to be unexpected and unforeseeable and therefore classifiable as "an act of God," that would not necessarily insulate the defendant from liability. Notwithstanding such an event, if one is negligent and his negligence concurs with the act of God in such a way that it is a proximate cause of damage to another, he is liable.[3] Consequent to the above, we proceed to the question of defendant's negligence.

Our statute imposes an affirmative duty of care upon those who divert waters for their own use. Section 73–1–8, U.C.A. 1953, provides that:

> The owner of any ditch . . . or other watercourse shall maintain the same in repair so as to prevent waste of water or damage to property of others.

We have held that this is but an enactment of the universal standard of due care under the circumstances [4]; but that this includes taking cognizance that the degree of care increases in proportion to the hazards anticipated, so that due to the dangers inherent in the control of water, the management of such a quantity of flowing water should be in the hands of someone of skill and experience.[5]

Upon learning of the storm, defendant's foreman, Ivan Hunt, rushed to the area. He observed that hail had accumlated about three inches deep and that the continuing torrential rain was melting the hail and great quantities of water were coursing downhill from the upper side (west) into the canal; that the canal was full to overflowing its eastern bank down toward the plaintiffs' property. He stated that he was interested mostly in seeing that the canal bank had not broken through. When questioned as to why he had not tried to use the means above mentioned to reduce the water in the canal he stated that he thought that the damage had been done and that it would do little good. But from his own testimony and other evidence in the record other reasonable inferences could be drawn.

1. *Charvoz v. Bonneville Irrigation District,* 120 Utah 480, 235 P.2d 780 (1951).

2. Ibid. It seems somewhat strange, but is nevertheless true, that when an occurrence is so totally unexpected and violent that it is discordant to reason and contrary to the usual course of nature it is blamed upon the Deity as an "Act of God."

3. See 169 A.L.R. 517, 536, Annot. Waters, Liability for Overflow, and cases cited therein.

4. *West Union Canal Co. v. Provo Bench Canal & Irrigation Co.,* 116 Utah 128, 208 P.2d 1119 (1949); *Jensen v. Davis & Weber Counties Canal Co.,* 44 Utah 10, 137 P. 635 (1913).

5. *Erickson v. Bennion,* 28 Utah 2d 371, 503 P.2d 139 (1972).

Upon Mr. Hunt being questioned about the planks in the spillway along the east side of the forebay he testified:

Q. Now, are there some planks in this area of the overflow that you mentioned?

A. Yes sir. That overflow I'd say is about 14 feet wide, it is cement over to about, I guess, five feet, and that's a good guess, and the five feet, there's the planks there that can be removed.

Q. Now, if the planks were removed at that place, would that affect the flow of water in hydro canal No. 2 up in the area of the Dougherty place?

A. It would go faster, yes.

* * * * * *

Q. . . . Had you pulled the boards out, it would have increased the flow of water down the ditch [canal], wouldn't it?

A. Yes sir.

Q. Had you opened the penstock all the way, it would have increased the flow of the water down the ditch, wouldn't it?

A. Yes sir.

Q. And wouldn't anything that increased the flow of water down that ditch help the people that were being flooded?

A. It would tend to.

There is also the testimony of Mr. Jacob Jones, defendant's plant operator, which tends to show that if the planks had been taken out that would have speeded up the flow of the canal and have prevented or at least reduced its flooding over its eastern bank and onto plaintiffs' property. He testified:

A. Well, the overflow is right there (indicating), you see, and those are the boards that should have been lifted if you wanted to prevent flooding above here (indicating).

Q. Now, was there some provision there where boards could be removed to stop flooding above it?

A. That's right.

Q. And is this the normal procedure in a cloudburst?

A. It's been done once or twice, I believe.

Q. That you actually know of?

A. Right.

Q. In other words, what you are saying is, you believe that if the overflow down below were pulled out or lowered in some way that possibly that canal could accommodate a greater stream of water?

A. I know it can.

Q. Now, what is the normal procedure when a flood occurs—let me rephrase it. When a flood occurs, what is the normal procedure at the point and the ditch to see that no harm comes?

A. Well, in this particular case *the boards could have been jerked out of the overflow below Dougherty's house and increased the flow three times.* [Emphasis added.]

■■ Under our rules of review, when the evidence is in dispute, and when different inferences may be drawn therefrom, it is the prerogative of the trial court to choose what evidence he will believe and also to deduce any inferences that can fairly and reasonably be drawn therefrom. In honoring that prerogative here, it is our opinion that there is a sufficient basis to support his conclusions that the defendant failed to exercise that degree of care which ordinary prudence required for the protection of the plaintiffs' property and that this was the proximate cause of the damage; and further, that the evidence does not compel a finding that the plaintiffs were guilty of any negligence which contributed to cause the damage.

Affirmed. Costs to plaintiffs (respondents).

TUCKETT, J., concurs.

HENRIOD, Chief Justice (concurring in the result):

I concur in the result, since the trial judge chose to canvass facts, which, if believed, in a very close case, would sustain him, albeit one may have to resort to a bit of dubious imagination here in pulling a reasonable prudent rabbit out of a judicial top hat, whichever way this case may have been decided. The main opinion has enunciated basic principles accurately, so that applying them to. the disputed facts, is not interpreting the law but repeating it, and applying it thereto.

The net result, what with a district judge, litigants and attorneys all over the place, plus the employment of the facilities, justices and personnel of this court, makes it abundantly clear to this author that the only real, substantial losers in this case, involving $896.27,—are the already overburdened· taxpayers.

ELLETT, Justice (dissenting):

I cannot find any negligence on the part of the defendant which was a proximate cause of any damage to the plaintiff. The defendant maintains a canal along the contour of some hills and above the Santa Clara River from which water is diverted and used to generate electric current. This canal has a capacity of 16 c. f. s. (cubic feet per second) and will not overflow when that amount of water flows in it.

On the day in question there was approximately 9 c. f. s. diverted from the river into the canal and, had it not been for a cloudburst of unprecedented proportions, that amount of water would have reached the defendant's power plant without any problems being raised.

The trouble arises from the fact that sheets of water from the hills ran into and across the canal and onto the plaintiffs' property. The defendant was guilty of no negligence whatsoever. However, the plaintiff, the trial court, and the main opinion herein give judgment against the defendant for some sort of "backhanded last clear chance opportunity" to avoid harm which defendant did not cause.

It is claimed that if the defendant had opened the penstock valve and pulled some planks out of its forebay (reservoir), the canal could have carried its augmented load of water safely past the plaintiffs' ·house.

In the first place the defendant owed no duty to the plaintiff to do anything which is claimed would have avoided his damage. In ·the second place the defendant had no opportunity to do the things now asserted to be the cause of the harm.

The plaintiff himself testified that he was at a neighbor's house about half a mile away when the flood began and by the time he got home,· "My wife was out with a shovel trying to block off the water coming out of the canal and she told me what had happened and what was happening . . . . I believe that there was not much said about the magnitude of the storm except the excessive amount of flooding and what we had to do to get our place protected."

Mr. Hunt, an employee of the defendant, was called as a witness by the plaintiff and testified that he went from his home to the power plant and took the generator off the line because of the flooding. He then went up the canal and described the condition thus:

> When I got on top of the hill by this Branham house there was hail, I imagine, three inches deep on the north side of the bushes and it had hailed and rained all over on the south side and there was water up around your knees or practically everywhere.

The Branham house was just above plaintiffs' home.

It thus is clear that the plaintiffs' place was flooded before anybody had an opportunity to do anything to prevent the water, which flowed in sheets, from the hills,

from escaping out of the canal and onto the plaintiffs' property.

For the reasons stated, I dissent. I would reverse the judgment and remand the case with directions to enter judgment for the defendant for no cause of action.

MAUGHAN, J., concurs in the views expressed in the dissenting opinion of Mr. Justice Ellett.