AMS SALT INDUSTRIES, INC., formerly known as American Salt Company, Plaintiff and Appellant,

v.

MAGNESIUM CORPORATION OF AMERICA, formerly known as Amax Magnesium Corporation, Defendant and Appellee.

No. 950451.

Supreme Court of Utah.

June 24, 1997.

Gary R. Howe, P. Bryan Fishburn, Zachary T. Shields, Salt Lake City, for plaintiff.

Carolyn B. McHugh, Clark Waddoups, Salt Lake City, for defendant.

RUSSON, Justice:

AMS Salt Industries, Inc., formerly known as American Salt Company ("AMS"), appeals from a summary judgment entered against it in the Third Judicial District Court of Salt Lake County. We affirm.

### BACKGROUND

AMS operated a salt-production business along the shores of the Great Salt Lake in Tooele County. As part of that business, AMS would pump water from the Lake into ponds where the water would then evaporate to the point where the salt could be extracted, a process known as solar evaporation. Magnesium Corporation of America, formerly known as AMAX Magnesium Corporation ("Mag Corp"), also operated a business along the shores of the Lake, several miles to the north of AMS. From its solar evaporation ponds, Mag Corp extracted brine which was used primarily to manufacture industrial chemicals such as magnesium and chlorine, but also was used to produce salt in direct competition with AMS.

AMS and Mag Corp each employed a system of dikes to keep the water and brine that was pumped into the solar evaporation ponds from escaping back into the Lake. As part of these dike systems, both AMS and Mag Corp had perimeter dikes that separated the actual Lake from their ponds.

Beginning in the early 1980s, Utah began receiving unusually high amounts of precipitation. Several years of deep snow followed by warm spring temperatures continually raised the level of the Lake. By June 1986, the Lake had reached an elevation of 4,211.85 feet, its highest recorded level. While the Lake was rising, AMS and Mag Corp were forced to strengthen and raise their perimeter dikes to keep the rising waters from flooding their ponds and other facilities. Prior to 1986, AMS expanded its operations and constructed solar evaporation ponds to the west of the county road that ran due south from the southernmost tip of Stansbury Island to Interstate 80 (the "West Ponds").

Thus, when the waters of the Lake began to rise, Mag Corp's perimeter dike to the north not only protected Mag Corp's ponds, but also was all that stood between the Lake and AMS's West Ponds, several miles to the south.

On June 7, 1986, a severe storm arose. High winds created large waves that pounded against and eventually breached Mag Corp's perimeter dike. When AMS was informed of the breach, it began efforts to raise the level of and strengthen the county road in an effort to save its ponds east of the county road. Over the course of the next two days, the Lake refilled its natural bed, destroying all of Mag Corp's internal dikes as well as AMS's internal dikes west of the county road. Thus, all of Mag Corp's ponds were lost, as were AMS's West Ponds. AMS's efforts to build up the county road, however, were successful, and the Lake's progress was halted before it could inundate AMS's ponds east of the county road.

In January 1990, AMS filed suit against Mag Corp for damages incurred, including claimed lost profits, as a result of the destruction of AMS's West Ponds. AMS asserted that Mag Corp was negligent in the design, construction, and maintenance of Mag Corp's perimeter dike. Additionally, AMS asserted other theories of recovery including breach of contract, strict liability, trespass, and nuisance.

Judge Pat B. Brian was originally assigned to the case. At the outset of the matter, Judge Brian informed counsel for AMS that he was a neighbor of one of Mag Corp's attorneys, but AMS's counsel indicated that he had no objection to Judge Brian's participation in the proceedings. On April 19, 1993, Mag Corp moved for summary judgment. In its motion, Mag Corp argued that it owed AMS no legal duty with respect to the perimeter dike and therefore could not be found negligent. After hearing arguments, Judge Brian, in October 1993, granted the motion with respect to all claims except AMS's negligence claim, holding that an issue of fact could exist with respect to whether Mag Corp owed AMS some kind of duty.

Shortly after the partial summary judgment, Judge Brian recused himself from any

further participation in the matter, and an order to that effect was filed on November 4, 1993. Following two more years of discovery, Mag Corp again moved for summary judgment, arguing that AMS had not presented any evidence that could establish any legal duty owed by Mag Corp to AMS. On July 10, 1995, Judge Rokich held a hearing on Mag Corp's motion. At that time, Judge Rokich determined to hold a subsequent hearing for the limited purpose of determining whether AMS's reliance on Mag Corp's dike was sufficiently reasonable to create a duty on the part of Mag Corp. The second hearing was held on July 21, 1995. At the conclusion of that hearing, Judge Rokich granted Mag Corp's motion for summary judgment. In his order, Judge Rokich stated that there were "no material issues of fact in dispute and Mag Corp [was] entitled to judgment as a matter of law."

On appeal to this court, AMS argues that Judge Rokich violated the "Law of the Case" doctrine in granting Mag Corp's summary judgment motion after it had previously been denied by Judge Brian. AMS further argues that the trial court's July 21, 1995, evidentiary hearing was improper because its scope was incorrectly limited to the issue of reliance and because in the context of a summary judgment motion, the court was resolving factual issues which should have been presented to a jury. Finally, AMS argues that the trial court erred in granting Mag Corp's motion for summary judgment because the trial court incorrectly concluded that Mag Corp owed AMS no duty of care relating to the design, construction, and maintenance of Mag Corp's perimeter dike.

Mag Corp responds that Judge Rokich did not violate the "Law of the Case" doctrine because the second motion for summary judgment was presented in a different light than the first. Further, Mag Corp asserts that the July 21, 1995, hearing was proper because the trial court was not resolving issues of fact but rather determining whether AMS could present any evidence of a material issue of fact relating to the duty question. Finally, Mag Corp argues that the trial court was correct in granting the summary judgment motion because AMS had failed to raise

a material issue of fact as to whether Mag Corp owed AMS a legal duty.

## STANDARD OF REVIEW

We will affirm a trial court's grant of summary judgment only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Utah R. Civ. P. 56(c); *Andreini v. Hultgren*, 860 P.2d 916, 918 (Utah 1993). On appeal from a summary judgment, we resolve only legal issues and review the trial court's conclusions of law for correctness. *Ferree v. State*, 784 P.2d 149, 151 (Utah 1989).

## ANALYSIS

### A. Law of the Case Doctrine

AMS argues that Judge Rokich violated the law of the case doctrine by granting Mag Corp's second summary judgment motion after Judge Brian had denied its first motion. We disagree. The law of the case doctrine has been applied in various situations. One branch of the doctrine stands for the general rule that "one district court judge cannot overrule another district court judge of equal authority." *Mascaro v. Davis*, 741 P.2d 938, 946 (Utah 1987); *see also Thurston v. Box Elder County*, 892 P.2d 1034, 1037 n. 2 (Utah 1995) (describing other applications of law of the case doctrine). However, there are several exceptions to this general rule. One such exception is when "the issues decided by the first judge are presented to the second judge in a 'different light,' *as where a summary judgment initially denied is subsequently granted after additional evidence is adduced.*" *Sittner v. Big Horn Tar Sands & Oil, Inc.*, 692 P.2d 735, 736 (Utah 1984) (emphasis added) (quoting *Richardson v. Grand Central Corp.*, 572 P.2d 395, 397 (Utah 1977)). This exception applies in the case before us.

Judge Brian denied Mag Corp's first motion for summary judgment only with respect to the question of whether Mag Corp owed AMS a legal duty. Two years of extensive discovery followed the denial of the motion. When Mag Corp again moved for summary judgment, Judge Rokich was initially hesitant to rule on the motion in light of Judge Brian's prior ruling. However, Judge Rokich ordered a hearing where both parties would have the opportunity to lay out the fruits of their two years of research and discovery on the duty issue. Despite his initial hesitation, and even after the benefit of a full hearing, Judge Rokich determined that no material issue of fact as to the duty question existed and therefore granted the motion for summary judgment.

As discussed below, we agree that AMS failed to produce any evidence creating a material issue relating to the duty question. Clearly, the "additional evidence ... adduced" following two years of discovery cast Mag Corp's second motion for summary judgment in a "different light" than its first motion. *Sittner*, 692 P.2d at 736; *Richardson*, 572 P.2d at 397. Thus, Judge Rokich was justified and did not violate the law of the case doctrine in granting the motion for summary judgment even though Judge Brian had previously denied it.

### B. Evidentiary Hearing

AMS argues that the trial court erred in conducting an evidentiary hearing in an attempt to resolve the duty question in connection with Mag Corp's second motion for summary judgment. By doing so, AMS claims, the trial court usurped the role of the jury by acting as a finder of fact and violated the Utah Constitution's guarantee of the right to a jury trial in civil cases. *See* Utah Const. art. I, § 10; *Int'l Harvester Credit Corp. v. Pioneer Tractor & Implement, Inc.*, 626 P.2d 418, 421 (Utah 1981). We disagree.

Questions of law are properly resolved by the trial court rather than the jury. We have previously held that "[t]he question of whether a duty exists is a question of law." *Loveland v. Orem City Corp.*, 746 P.2d 763, 766 (Utah 1987); *Weber v. Springville City*, 725 P.2d 1360, 1363 (Utah 1986). AMS correctly points out that to determine whether a duty exists, a court may have to evaluate relevant facts and available evidence. However, in doing so the court does not necessarily take upon itself the role of fact finder. We recently pointed out in *Harline v. Bark-*

*er*, 912 P.2d 433 (Utah 1996), that general fact questions and applications of legal standards to specific facts are the types of questions to be decided by a jury, but only "if reasonable persons could differ about them on the evidence." *Id.* at 439 (quoting W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 45, at 320 (5th ed.1984)). Thus, where there could be no reasonable difference of opinion on these questions in light of the available evidence, "the decision is one of law for the trial judge or for an appellate court." *Id.* Further, "when the facts are so tenuous, vague, or insufficiently established that determining [the legal issue] becomes 'completely speculative,' the claim fails as a matter of law." *Id.*

■ It is not only permissible, but often unavoidable, that a trial court must hold hearings to review evidence before ruling on a question of law. After such a hearing, if the trial court determines that there is disputed evidence which is material to the relevant question of law, then the issue should be left for the jury to decide. However, if after such a hearing the trial court determines either that reasonable minds could not differ as to the conclusion to draw from the evidence or that the evidence adduced was simply insufficient to sustain the legal claim, then the trial court should rule on the issue as a matter of law. In the case before us, the trial court made it clear that the purpose of the evidentiary hearing was not to resolve disputed material issues of fact, but rather to determine what evidence, if any, supported AMS's claim that Mag Corp owed it a legal duty based on a mutual reliance theory. In explaining this purpose to counsel for AMS, the trial court stated: "Bring in all the evidence that you can to show the basis upon which you relied and I'll hear it. We will take a day and I'll hear it, and then I'll make a ruling." Thus, the trial court did not err in holding an evidentiary hearing in this case.[1]

■ AMS next argues that if the evidentiary hearing was proper, then the trial judge erred in not making findings of fact as required by rule 52 of the Utah Rules of Civil Procedure.[2] AMS claims that the hearing in this case was held to resolve disputed material facts and thus was an "action tried upon the facts without a jury" under rule 52. However, as we have already discussed, and as we discuss in more detail in the following section, the trial court in the case before us did not resolve disputed material facts in the evidentiary hearing. Rather, the trial court held the hearing to determine whether the available evidence sufficed to support AMS's theory that Mag Corp owed it a legal duty in light of a summary judgment motion. After determining that it was not, the court granted the motion. As rule 52 itself states, "The trial court need not enter findings of fact and conclusions of law in rulings on motions...." Thus, the trial court did not need to make findings of fact in this case.

### C. Duty Question

AMS next argues that the trial court erred when it held as a matter of law that Mag Corp owed no legal duty to AMS in relation to the construction, design, and maintenance of Mag Corp's perimeter dike. AMS argues that the trial court improperly focused on the issue of mutual reliance in determining whether a duty existed and that other factors, such as foreseeability and statute-based policy considerations, should have been considered. Additionally, AMS argues that Utah case law and certain common law doctrines imposed a legal duty on Mag Corp in this case. We disagree.

■ "One essential element of a negligence action is a duty of reasonable care owed to the plaintiff by [the] defendant. Absent a showing of duty, [the plaintiff] cannot recover." *Beach v. University of Utah*, 726 P.2d 413, 415 (Utah 1986) (citations omitted). In his treatise on the law of torts, Professor Keeton gives this general definition of "duty": "A duty, in negligence cases, may be

---

1. Whether the trial court's legal conclusion based upon the hearing and the evidence was correct is a separate question which we address in the following section.

2. Rule 52 of the Utah Rules of Civil Procedure states in relevant part, "In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon ...."

defined as an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another." W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 53, at 356 (5th ed.1984); *see also* 57A Am.Jur.2d *Negligence* § 83 (1989). The circumstances that may give rise to such an obligation, however, are varied. As Justice Durham points out, "The majority [of this court] correctly states that treatment of the issue of duty requires an analysis of the legal relations between the parties." *Loveland v. Orem City Corp.*, 746 P.2d 763, 778 (Utah 1987) (Durham, J., concurring). Legal duties are often found to exist in the context of contractual, fiduciary, and filial relationships. None of these relationships are present in this case, however.

 Several other factors may be relevant in ascertaining whether there is a duty. AMS correctly points out that foreseeability can be one of those factors. It is not, however, the only factor. In a concurring opinion, Justice Stewart wrote, "The existence of a duty of reasonable care depends *in part* on the extent to which a reasonable person can foresee that his acts may create a significant likelihood of causing harm to others." *Cruz v. Middlekauff Lincoln–Mercury*, 909 P.2d 1252, 1258 (Utah 1996) (Stewart, Assoc.C.J., concurring) (emphasis added). In *Little v. Utah State Division of Family Services*, 667 P.2d 49 (Utah 1983) we stated, " 'Whether the law imposes a duty does not depend upon foreseeability alone. The likelihood of injury, the magnitude of the burden of guarding against it and the consequences of placing that burden upon defendant, must also be taken into account.' " *Id.* at 54–55 (quoting *Lance v. Senior*, 36 Ill.2d 516, 224 N.E.2d 231 (1967)). A duty may also be found on the basis of reasonable mutual reliance, voluntary conduct which increases the risk of harm, and general policy considerations. *See* 57A Am.Jur.2d *Negligence* §§ 87, 89 (1989); *DeBry v. Valley Mortgage Co.*, 835 P.2d 1000, 1003 (Utah.Ct.App.1992).

#### 1. Scope of Second Hearing

 In the case before us, after Judge Brian had granted Mag Corp's first motion for summary judgment, AMS's only remaining claim against Mag Corp was based on negligence. When Mag Corp made its second motion for summary judgment before Judge Rokich, it argued that AMS could not establish any evidence to show a legal duty owed AMS by Mag Corp. In its memorandum in opposition to the motion, AMS argued that Mag Corp did have a duty based on statutory policy considerations, Utah land policy, case law, foreseeability, and reliance. Judge Rokich held an initial hearing on the motion on July 10, 1995. During that hearing, not only was the issue of mutual reliance discussed, but also AMS made arguments that Mag Corp had a duty based on (1) statute-based policy considerations, (2) general common law as expressed in the Second Restatement of Torts, and (3) case law. The trial court explicitly rejected the arguments relating to statute-based policy and implicitly rejected all others when it concluded that it would hold a second hearing limited only to arguing the basis on which AMS felt that it could rely on Mag Corp's perimeter dike. Importantly, Judge Rokich gave AMS the chance to argue that the issue of reliance should not be the focus of the hearing. In response to AMS's question whether reliance would be the sole issue, the trial court stated: "Right. And I think that's the issue in this case. If I'm wrong, tell me now if you see it differently." Instead of objecting, AMS agreed to the hearing and its limited scope. Thus, because the trial court had rejected AMS's other arguments relating to the basis for Mag Corp's alleged duty, it was not improper to limit the scope of the second hearing to the issue of reliance.

#### 2. Legal Conclusions

We now address whether the trial court correctly concluded that Mag Corp owed no legal duty to AMS. We believe it did.

#### a. Reliance

AMS first argues that there was evidence to show that Mag Corp owed it a duty of care based on the fact that AMS reasonably relied upon Mag Corp's perimeter dike. The evidence to which AMS refers includes testimony that AMS employees had seen Mag Corp employees observing the construction of

AMS's perimeter dike, testimony that Mag Corp had allowed AMS employees to drive the length of Mag Corp's perimeter dike, some alleged discussions about mutual protection between employees from both AMS and Mag Corp at a service station, and a presentation made in 1986 by Mag Corp to the Utah State Committee on Economic Development. None of these "evidences," however, were material.

█ It is only natural that employees of AMS and Mag Corp were interested in the ongoing diking efforts. However, AMS's own employees testified that there were no discussions during those "inspections" that would indicate mutual reliance sufficient to create a duty. In fact, Roger Peterson, AMS's own witness and plant manager, testified that there was nothing "that Mag Corp did or said . . . that would indicate that it was going to do something more to protect" AMS other than Mag Corp's own interest in protecting itself. At the hearing, it also became clear that there was no evidence at all that a discussion relating to mutual reliance took place in the service station. Finally, Mag Corp went before the Committee for Economic Development to request financial help in its efforts to dike the rising Lake. However, AMS was never in any way involved in Mag Corp's presentation to the Committee, Mag Corp did not discuss AMS or its operations with the Committee, and the AMS employee who overheard part of the presentation could remember nothing about it. Clearly, there was no evidence whatever to support AMS's position that it and Mag Corp had mutually relied on one another's diking efforts, and the trial court was correct in so holding.

### b. Foreseeability

█ AMS next argues that perhaps the most important issue in determining if Mag Corp owed it a legal duty is the issue of foreseeability. AMS argues that Mag Corp owed it a duty of care because "it was foreseeable that AMS would sustain damage if the dike failed." In making this argument, however, AMS misses the point. It was the Lake, not Mag Corp, which caused the foreseeable risk of damage. Nature, not Mag Corp, caused the Lake to rise and threaten AMS's property. In *Rocky Mountain Thrift Stores, Inc. v. Salt Lake City Corp.*, 887 P.2d 848 (Utah 1994), we noted that the floods which occurred during the early 1980's were "extraordinary and unprecedented." *Id.* at 852. We then approvingly cited *Golden v. Amory*, 329 Mass. 484, 109 N.E.2d 131 (1952), which

> held that the defendants, owners and managers of a dike, were not negligent as a matter of law when, after an extraordinary flood began, they used all available help to sandbag a dam but did nothing to save a dike. The court stated that "the defendants were not negligent even if some other action than that taken would have been better."

*Id.*, 109 N.E.2d at 132. In the *Golden* case, even abandonment of an existing dike was excused, although the risk of harm from abandoning the dike was foreseeable under the extreme circumstances caused by the flood. In the case before us, the extreme conditions caused by the continually rising Lake and the severe storm of June 7, 1986, were the foreseeable source of damage both to Mag Corp's dike and to AMS's property. The trial court correctly concluded that the doctrine of foreseeability imposed no duty upon Mag Corp in this case.

### c. General Common Law

█ AMS next argues that Mag Corp owed it a duty of care in the construction, design, and maintenance of the perimeter dike based on general common law principles set out in sections 364 and 365 of the Second Restatement of Torts. We disagree. Section 364 of the Restatement (Second) of Torts reads as follows:

> A possessor of land is subject to liability to others outside of the land for physical harm caused by a structure or other artificial condition on the land, which the possessor realizes or should realize will involve an unreasonable risk of such harm, if
>
> (a) the possessor has created the condition, or
>
> (b) the condition is created by a third person with the possessor's consent or

acquiescence while the land is in his possession, or

(c) the condition is created by a third person without the possessor's consent or acquiescence, but reasonable care is not taken to make the condition safe after the possessor knows or should know of it.

Section 365 of the Restatement (Second) of Torts reads in pertinent part:

A possessor of land is subject to liability to others outside of the land for physical harm caused by the disrepair of a structure or other artificial condition thereon, if the exercise of reasonable care by the possessor or by any person to whom he entrusts the maintenance and repair thereof

(a) would have disclosed the disrepair and the unreasonable risk involved therein, and

(b) would have made it reasonably safe by repair or otherwise.

As with the statutory provisions discussed above, the dynamic created by the necessity of protecting against flooding renders these provisions inapplicable in this case. Both Restatement sections refer to dangerous conditions *created by the possessor of the land.* However, it was the rising Lake combined with the severe storm of June 7, 1986, which created the dangerous condition in this case, not Mag Corp. Further, section 365 explicitly exempts our case in comment b. when it states:

If a structure suddenly and without the fault of the possessor becomes dangerously dilapidated, the possessor is *not subject to liability for any harm done by it to persons outside of the land until he has had an opportunity by the exercise of reasonable care to make the structure safe.*

In the case before us, the storm on June 7 "suddenly and without the fault" of Mag Corp "dangerously dilapidated" the perimeter dike. Thus, Mag Corp was clearly not liable under the Restatement for the damages which followed.

### d. Utah Case Law

AMS argues that Utah case law also imposes a duty of care on Mag Corp in this case. AMS cites several cases that it claims support its view. However, these cases are inapplicable in this case. Most of these are immediately distinguishable because they refer to the duty of care imposed upon owners of irrigation canals or ditches. *See Dougherty v. California–Pacific Util. Co.,* 546 P.2d 880 (Utah 1976); *Erickson v. Bennion,* 28 Utah 2d 371, 503 P.2d 139 (1972); *Jensen v. Davis & Weber Counties Canal Co.,* 44 Utah 10, 137 P. 635 (1913); *Lisonbee v. Monroe Irr. Co.,* 18 Utah 343, 54 P. 1009 (1898). These ditches and canals were not created to alleviate flood conditions but rather were created by the defendants to manipulate the normal flow of water for commercial purposes. Consequently, these cases are irrelevant for our purposes.

The other Utah case to which AMS refers is somewhat more applicable, but not much. In *McKell v. Spanish Fork City,* 6 Utah 2d 92, 305 P.2d 1097 (1957), a landowner brought suit against the city of Spanish Fork after flood waters damaged the landowner's property. When it became apparent that a flood was coming, the city determined to enlarge the bed of the Spanish Fork River to contain the imminent flow of water and to raise a dike to keep water from damaging city-owned properties. When the flood actually arrived, its magnitude "was far beyond anything that reasonably might have been anticipated even for a flood." *Id.,* 305 P.2d at 1100. The waters diverted by the dike flowed onto the plaintiff's property, damaging it. This court cautioned against obstructing the flow of a natural water course (e.g., a river) by negligently constructing protective devices. In the end, however, the court held that the city was not liable to the landowner because of the exceptional circumstances created by the flood:

The rule ... which allows the owner of lands threatened by the waters of an extraordinary flood to erect defensive barriers without liability to adjoining landowners whose lands may be damaged thereby, is supported not only by the weight of authority but by sound reasoning as well. To impose liability for such damage would be to leave property holders to the mercy of the elements and compel surrender to the force of rampant waters.

*Id.* The cases relied upon by AMS, therefore, are either inapplicable or they support the view that Mag Corp should be relieved of any duty to AMS in this case.

### e. Policy Considerations

■ AMS argues that certain provisions of the Utah Code relating to canals, watercourses, ditches, dams, and other "diverting works" express statute-based policies that can form the basis of Mag Corp's alleged duty. *See, e.g.*, Utah Code Ann. §§ 73–1–8 (relating to owners of ditches), 73–5–5 & –6 [3] (relating to dam safety). AMS is incorrect, however. The statutory provisions in effect at the time Mag Corp's perimeter dike was in use relate to the complicated procedures to be followed and the specifications to be met before the state of Utah would approve any plans to build an "impounding dam." Mag Corp's perimeter dike was not an impounding dam. The term "impounding" refers to keeping water within a confined area, such as a reservoir. *See, e.g., Webster's Ninth New Collegiate Dictionary* 605 (1985). Once the Lake began to rise, the purpose of Mag Corp's perimeter dike, rather than to keep water in, was to keep water out. It would be absurd to require every landowner facing property damage who decides to sandbag his property in the face of a flood to go through the lengthy and complicated approval process applicable to dams outlined in the statutes. The flood waters would come and go long before approval had been secured. Thus, the trial court correctly concluded that the statutes cited by AMS did not impose any duty upon Mag Corp in this case.

Holding that Mag Corp had a duty to AMS in the case before us would lead to an inane result. To so hold would impose upon any property owner along the Lake who constructs a dike to prevent the Lake from flooding his property potential liability to every owner of property for miles beyond. If such were the law, no one would ever dare to take measures to protect against flooding. If anything, the property owners beyond benefit from such efforts. In the case before us, but for the efforts of Mag Corp to raise its dike at a cost of $33 million, AMS's property would have flooded long before it did. AMS contributed nothing in either manpower or money to the raising of Mag Corp's dike, yet AMS benefitted from the dike's protection for years. Saying that Mag Corp owed some legally actionable duty to AMS to protect it more than it already had would be absurd.

## CONCLUSION

On the basis of the foregoing, we conclude that the trial court did not err in granting Mag Corp's motion for summary judgment.

ZIMMERMAN, C.J., and HOWE, BRAITHWAITE, and TAYLOR, JJ., concur in Justice RUSSON's opinion.

Having disqualified themselves, STEWART, Associate C.J., and DURHAM, J., do not participate herein; STANTON M. TAYLOR, District Judge and ROBERT T. BRAITHWAITE, District Judge, sat.

---

3. These provisions of the Utah Code were repealed and replaced in 1990 by §§ 73–5a–101 to –702.