*This opinion is subject to revision before final
publication in the Pacific Reporter*

**2014 UT 2**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

KAREENA MACGREGOR,
*Plaintiff and Appellant,*

*v.*

DOUGLAS WALKER, individually and in his official capacity as
Bishop of the Willow Canyon 4th Ward, Sandy Utah East Stake of
the Church of Jesus Christ of Latter-Day Saints; CORPORATION OF
THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY
SAINTS, a Utah corporation sole et al.;
*Defendants and Appellees.*

No. 20120452
Filed January 28, 2014

Third District, Salt Lake
The Honorable Glen K. Iwasaki
No. 080906065

Attorneys:

William M. Fontenot, Bountiful, for appellant

L. Rich Humphreys, Karra J. Porter, Alexander Dushku,
Justin W. Starr, Salt Lake City, for appellee

JUSTICE PARRISH authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE NEHRING,
JUSTICE DURHAM, and JUSTICE LEE joined.

JUSTICE PARRISH, opinion of the Court;

¶1     We are asked to decide whether a church's creation of a help line for the benefit of its clergy gives rise to a duty to parishioners who counsel with clergy. Specifically, we are asked to determine whether, pursuant to section 323 of the Restatement (Second) of Torts, the Church of Jesus Christ of Latter-day Saints (LDS Church or Church) and its clergy voluntarily assumed a duty to aid abuse victims by virtue of its "Help Line." This professionally staffed Help Line provides Church clergy who become aware of an abusive situation with information about legal duties and counseling options. We conclude that the Church's creation of the Help Line did not give rise to such a duty because, regardless of whether the Church voluntarily undertook to render a service to abuse victims

by virtue of the Help Line, a clergy member's failure to use the Help Line does not increase a victim's risk of harm. Moreover, public policy disfavors the imposition of a duty where it would discourage organizations from providing services that may ultimately benefit victims of abuse.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. THE CHURCH'S HELP LINE

¶2    In 1995, the Church established the Help Line, a 1-800 number that bishops and other Church clergy can call when they become aware of possible abuse. The Help Line is available 24 hours a day, 365 days a year and is staffed by legal and counseling professionals who "provide guidance to the bishop on how to protect the [victim] from further abuse, and how to deal with the complex emotional, psychological, and legal issues that must be addressed in order to protect the victim." In some cases, attorneys are also available to "advise bishops on legal issues to ensure compliance with reporting statutes."

¶3    The Help Line is available only to Church ecclesiastical leaders. Help Line employees neither learn the names of potential victims, nor do they communicate with the victims. In cases where Church leaders use the Help Line, they still have the discretion to proceed as they believe appropriate under the circumstances.

### II. MACGREGOR'S ALLEGATIONS AGAINST THE CHURCH DEFENDANTS

#### *A. MacGregor's Relationship with Her Teenage Neighbor and Interactions with Clergy*

¶4    Beginning at the age of twelve and continuing until age fifteen, Kareena MacGregor engaged in regular sexual touching with her neighbor Matthew, who was four years older than she. MacGregor's parents, Matthew's parents, and the police each became aware of MacGregor and Matthew's relationship. When MacGregor was either fourteen or fifteen, she also met and became sexually involved with Gregory, who was seventeen at the time.[1]

---

[1] In September 2002, at the age of fifteen, MacGregor gave birth to Gregory's baby in her home. MacGregor alleged that she did not know she was pregnant until after giving birth. The baby died after MacGregor put him in a window well. *See State ex rel. K.M.* for a more thorough recitation of the facts surrounding MacGregor's

(continued...)

2

¶5 During this time frame, MacGregor alleges that she met and counseled with her and Matthew's LDS bishop, Douglas Walker, on two separate occasions.[2] MacGregor allegedly told Walker that she wanted the relationship with Matthew to stop and that she wanted to repent. According to MacGregor, Walker told her to pray, read her scriptures, and stop seeing Matthew. MacGregor never informed Walker of her relationship with Gregory. Walker was aware of the Help Line and had used it on other occasions, but he did not call the Help Line "about any issue relating to [MacGregor]."

B. *MacGregor's Personal Injury Suit Against the Church Defendants*

¶6 In April 2008, MacGregor filed a personal injury suit against Walker, the Church (collectively the Church Defendants), and several other defendants.[3] MacGregor initially premised her claim against the Church Defendants on the theory that Walker owed her a duty of care based on her status as a member of his congregation and that Walker negligently failed to report the abuse as required by Utah Code section 62A-4a-403(3)(a) (Reporting Statute). She also alleged that the Church was vicariously liable for Walker's negligent conduct under the doctrine of respondeat superior.

¶7 The Church Defendants moved for summary judgment, asserting that they owed no duty to MacGregor. Specifically, they argued that the reporting statute imposes criminal penalties only and does not give rise to a duty that would support a negligence claim. The Church Defendants also argued that there is no "special relationship" between a church and its members that would impose on it a duty to protect its members against the criminal acts of third parties. In response, MacGregor disclaimed any suggestion that the Church's duty arose by virtue of the Reporting Statute or a special relationship between the Church and its members. Instead, she argued that, by creating the Help Line, the Church voluntarily

---

[1](...continued)
pregnancy and the baby's death. 2007 UT 93, 173 P.3d 1279.

[2] In their motion for summary judgment, the Church Defendants denied that Walker had any knowledge of the abuse, but they assumed knowledge solely for summary judgment purposes.

[3] MacGregor also named Gregory, Matthew, Matthew's parents and brother, Deseret Memorial Inc., and Holbrook Funeral Chapel Inc. as defendants in the suit.

undertook a duty to help MacGregor and all other Church members who are victims of child abuse. She further alleged that Walker breached that duty by failing to call the Help Line regarding her case.

¶8     Because MacGregor did not raise this voluntary undertaking theory in her complaint, the district court found the claim was not properly pled. But it nevertheless chose to address the claim "in an effort to decide the matter on its merits rather than a technicality." After considering supplemental briefing regarding the Help Line, the district court granted summary judgment in favor of the Church Defendants. In granting summary judgment, the district court did not rely on the voluntary undertaking theory; instead it reasoned that the Church Defendants were immune from suit under the First Amendment in the U.S. Constitution.

¶9     MacGregor appeals the dismissal of her claims against the Church Defendants. She contends that the Church voluntarily assumed a duty by virtue of the Help Line and that the district court erred in concluding that the Church was immune from suit under the First Amendment. We do not reach the issue of First Amendment immunity because we find that even if the Church Defendants voluntarily undertook to render a service to MacGregor by virtue of the Help Line, the existence of the Help Line did not increase MacGregor's risk of harm. We have jurisdiction pursuant to Utah Code section 78A-3-102(3)(j).

## STANDARD OF REVIEW

¶10    "The determination of whether a legal duty exists falls to the court. It is purely a legal question" and is therefore reviewed de novo. *Yazd v. Woodside Homes Corp.*, 2006 UT 47, ¶ 14, 143 P.3d 283.

## ANALYSIS

¶11    An essential element of every negligence action is the existence of a duty of care owed by the defendant to the plaintiff.[4] *Jeffs ex rel. B.R. v. West*, 2012 UT 11, ¶ 5, 275 P.3d 228; *see also Young*

---

[4] In addition to establishing a duty, a plaintiff must also establish "(2) that the defendant breached that duty, (3) that the breach of duty was the proximate cause of the plaintiff's injury, and (4) that the plaintiff in fact suffered injuries or damages." *Torrie v. Weber Cnty.*, 2013 UT 48, ¶ 9, 309 P.3d 216 (internal quotation marks omitted).

*v. Salt Lake City Sch. Dist.*, 2002 UT 64, ¶ 12, 52 P.3d 1230. ("Absent a showing that the defendant owed any duty, the plaintiff's claim has no merit . . . ."). A duty exists where defendant has "an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another." *AMS Salt Indus., Inc. v. Magnesium Corp. of Am.*, 942 P.2d 315, 321 (Utah 1997) (quoting W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 53 (5th ed. 1984)).

¶12 In most situations, tort law imposes a general duty to exercise reasonable care to minimize the risk of harm from one's actions. DAN B. DOBBS, THE LAW OF TORTS, § 251 (2d ed. 2011). But a person ordinarily has no affirmative duty to act to "protect another from harm," unless an exception applies. *Gilger v. Hernandez*, 2000 UT 23, ¶ 15, 997 P.2d 305. Here, MacGregor argues that the Church Defendants owed her an affirmative duty to act under section 323 of the Restatement (Second) of Torts. Section 323 provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking.

¶13 We adopted section 323 in *DCR Inc. v. Peak Alarm Co.*, 663 P.2d 433, 436 (Utah 1983), but we later explained that "the nature of this rule requires the Court to narrowly construe the scope of any assumed duty." *Weber ex rel. Weber v. Springville City*, 725 P.2d 1360, 1364 (Utah 1986). Therefore, to establish a negligence claim based on a theory of voluntary undertaking under section 323, MacGregor must show (1) that the Church, by means of the Help Line, undertook to render a service to her; and (2) that the Church Defendants failed to exercise reasonable care in their administration of the Help Line, thereby either increasing MacGregor's risk of harm or causing MacGregor's harm through her reliance on the Help Line. We do not reach the merits of the parties' respective arguments under the first prong of section 323 because we conclude that MacGregor has not met her burden under the second prong. We also conclude that public policy does not support the imposition of a duty in this case. We therefore affirm the district court's order granting the Church Defendants' motion for summary judgment.

## I. REGARDLESS OF WHETHER THE CHURCH UNDERTOOK TO RENDER A SERVICE TO MACGREGOR, ANY SUCH UNDERTAKING DID NOT INCREASE MACGREGOR'S RISK OF HARM

¶14    MacGregor argues that, by establishing the Help Line, "the Church has undertaken [a] duty categorically for its child members," including herself as a victim of abuse.  The Church Defendants disagree, arguing that the Help Line exists solely to assist Church clergy.  Specifically, they argue that the Help Line "renders internal Church services only and thus provides only indirect benefit to victims."

¶15    In support of their position, the Church Defendants rely on a line of cases that interpret section 323 to apply "only when the defendant undertakes to provide a service *directly* to the person injured."  *Russell v. United States*, 631 F. Supp. 1, 2 (D. Utah 1983) (emphasis added); *see also Thorson v. Mandell*, 525 N.E.2d 375, 378 (Mass. 1988) ("The creation of a policy against gymnastics in the auditorium was not an undertaking to render services for the protection of its users."); *Charleston v. Larson*, 696 N.E.2d 793, 801 (Ill. App. Ct. 1998) ("[P]laintiff's voluntary undertaking theory . . . fails at the outset because plaintiff never alleged that defendant under-took services for *plaintiff* . . . .") (emphasis in original).  The Church Defendants argue that the Help Line was created for the direct benefit of Church clergy only and that abuse victims are merely potential indirect beneficiaries.  They therefore assert that the Help Line does not give rise to a duty to mitigate any harm suffered by abuse victims.

¶16    There is, however, a second line of cases that provides for a more generous reading of section 323.  In *Wark v. United States*, for example, the Tenth Circuit held that for section 323 to apply, a plaintiff must first show that the defendant "through its affirmative acts or through a promise to act, undertook to render a service that was *reasonably calculated* to prevent the type of harm that befell the plaintiff."  269 F.3d 1185, 1189 (10th Cir. 2001) (emphasis added); *see also Jefferson Cnty. Sch. Dist. R-1 v. Justus ex rel. Justus*, 725 P.2d 767, 771 (Colo. 1986) (en banc) (same).   Under this interpretation of section 323, it could be argued that the Church's creation of the Help Line was reasonably calculated to prevent the type of harm experienced by abuse victims like MacGregor.

¶17    The plain language of section 323 could arguably sustain a third interpretation that neither party has argued.  Section 323 states that a duty arises only when one undertakes "to render

services to another *which he should recognize as necessary for the protection of the other's person or things*." (Emphasis added). Under this provision, a duty would arguably arise only if MacGregor could show that the Church Defendants should have recognized that calling the Help Line was *necessary* for her protection.

¶18    But we need not consider these alternative interpretations of section 323 because, regardless of whether the Church Defendants undertook to render a service to MacGregor, MacGregor has not met her burden of showing that this alleged undertaking increased her risk of harm.

¶19    Before a duty arises under section 323, a plaintiff must establish not only the existence of a voluntary undertaking, but also that (a) the undertaking increased plaintiff's risk of harm, or (b) the harm suffered by the plaintiff resulted from plaintiff's reliance on the undertaking. MacGregor does not claim that she relied on the Help Line. We therefore consider whether the Church's creation of the Help Line increased her risk of harm.

¶20    In *Alder v. Bayer Corp. AGFA Division*, we held that subsection (a) of section 323 "requires some change in conditions that increases the risk of harm to the plaintiff over the level that existed before the defendant became involved." 2002 UT 115, ¶ 30, 61 P.3d 1068 (internal quotation marks omitted). A mere failure "to facilitate the prevention of harm that occurred through other causes" is insufficient. *Id.* (internal quotation marks omitted).

¶21    *Fishbaugh v. Utah Power & Light, a Division of Pacificorp* illustrates the application of subsection (a). 969 P.2d 403 (Utah 1998). In *Fishbaugh*, a pedestrian was injured when he was hit by a car on an unlighted street. *Id.* at 404. The city had installed street lights, but the lights malfunctioned and were not lit at the time of the accident. *Id.* The plaintiff acknowledged that the city had no duty to provide lighting but argued that, having chosen to do so, the city had a duty to maintain the lights in working order. *Id.* at 406.

¶22    We rejected this argument, reasoning that "liability under . . . section [323] is generally limited to instances where the failure to exercise reasonable care in the undertaking has placed the injured party in a worse position than he would have been in had the undertaking not occurred." *Id.* at 407. Because the city's decision to install lighting made the plaintiff no worse off "than if the street lights had never been installed," the city had no duty "to maintain the streetlights simply because it installed them." *Id.*

¶23 This interpretation of section 323 is consistent with that of other courts. For example, in *Jain v. State*, the Iowa Supreme Court concluded that section 323(a) "applies only when the defendant's actions increased the risk of harm to plaintiff relative to the risk that would have existed *had the defendant never provided the services initially.*" 617 N.W.2d 293, 299 (Iowa 2000) (emphasis added) (internal quotation marks omitted). In other words, "the defendant's negligent performance must somehow put the plaintiff in a worse situation than if the defendant had never begun performance." *Id.* (internal quotation marks omitted).

¶24 MacGregor's claim does not satisfy subsection (a) because neither the creation of the Help Line nor Walker's alleged failure to use it *increased* the risk of harm to MacGregor. In other words, Walker's alleged negligent performance did not put MacGregor in a worse position than she would have been in had the Church never created the Help Line.

¶25 MacGregor argues that "the psychological impact resulting from Walker's inaction 'launched a force or instrument of harm' and was not merely a 'failure to facilitate the prevention of harm that occurred through other causes'" (quoting *Alder*, 2002 UT 115, ¶ 30). But section 323, by its very terms, requires "physical harm" from the negligently rendered services. Psychological or emotional harm is insufficient.

¶26 We hold that even if the Church had undertaken to protect MacGregor and other potential abuse victims by virtue of the Help Line, MacGregor's risk of harm was not increased relative to the risk she would have faced had the Church never created the Help Line in the first place. Thus, MacGregor's section 323 claim fails.

## II. IMPOSING A DUTY IN THIS CASE IS CONTRARY TO PUBLIC POLICY[5]

¶27 MacGregor also argues that general notions of public policy support the imposition of a duty on the Church Defendants.

---

[5] A court may look to general policy considerations when determining the existence of a duty. *AMS Salt Indus. Inc. v. Magnesium Corp. of Am.*, 942 P.2d 315, 321 (Utah 1997). As Dean Prosser famously noted, "duty is not sacrosanct in itself, but is only an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection." W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 53 (5th ed. 1984)).

Specifically, she reasons that "public policy does not favor holding persons or institutions harmless for the kind of claim that [MacGregor] is bringing against Walker and the Church." We disagree. Contrary to MacGregor's argument, public policy would actually *disfavor* imposing a duty in cases such as this for fear that imposition of a duty would chill efforts to prevent abuse and assist victims. Creation of programs and resources that have the potential to benefit victims of abuse should be encouraged, not discouraged by the threat of potential liability. *See, e.g., Pytlewski v. United States*, 991 F. Supp. 1043, 1050 (N.D. Ill. 1998) ("A finding that such a manual or policy in and of itself created a legal duty on the part of the business . . . would discourage businesses from producing or formulating such guidelines, which would be detrimental to the general public's best interest.").

¶28 We rejected the assertion of a duty in *AMS Salt Industries, Inc. v. Magnesium Corp. of America* for similar policy reasons. 942 P.2d 315, 324 (Utah 1997). In that case, Magnesium Corp. built a dike to protect its own land from flooding. *Id.* at 317. The dike also benefitted other owners, until it failed. *Id.* at 317–18. Flood victims filed suit against Magnesium Corp., alleging it had a duty to protect neighboring property from flooding. *Id.* We held that imposing a duty on Magnesium Corp. as to other property owners would be "absurd" because it would threaten landowners with "potential liability to every owner of property for miles beyond." *Id.* at 324. As a result, "no one would ever dare to take measures to protect against flooding." *Id.*

¶29 The Church, through its Help Line, provides a service intended to assist its ecclesiastical leaders in counseling abuse victims. It is certainly not the only organization with internal policies, procedures, training, and resources designed to reduce the risk of abuse and assist victims. To hold that the creation of such policies and programs gives rise to a duty under tort law would discourage organizations from creating these beneficial programs.

¶30 Moreover, we must be even more sensitive when assessing a religious organization's internal policies. "The delicate balance between the freedom to exercise religion and the demands placed on all persons (clerical and others) by civil law requires us to proceed cautiously in a controversy where we are asked to hold that a religious institution's reliance on its own written policy . . . gives rise to liability under civil law." *Petrell v. Shaw*, 902 N.E.2d 401, 409–10 (Mass. 2009). Because imposing a duty on the Church in this case would be contrary to public policy, we decline to do so.

## CONCLUSION

¶31   We affirm the district court's entry of summary judgment in favor of the Church Defendants.  The Church's creation of the Help Line did not give rise to a duty to MacGregor because, regardless of whether the Church undertook to render a service to MacGregor by virtue of the Help Line, the existence of the Help Line did not increase her risk of harm.  The risk MacGregor faced was the same as that she would have faced had the Church never created the Help Line.  And the imposition of a duty based solely on the creation of the Help Line would be contrary to public policy because it would discourage organizations from providing such services.

———————